## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
**UNITED STATES OF AMERICA**          .
                                      .
       **v.**                         .
                                      .          **1:19-cr-00118-LEW**
**JOSE MIRANDA,**                     .
                                      .
              **Defendant.**          .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DEFENDANT MIRANDA'S MOTION TO SUPPRESS
### WITH INCORPORATED MEMORANDUM OF LAW

**NOW COMES** defendant Jose Miranda, through counsel, and moves this honorable Court

to suppress at trial all evidence obtained, seized, or otherwise resulting from (a) the seizure of a

vehicle driven by Cody Look in which Mr. Miranda was the passenger on March 11, 2019 – and

of Mr. Miranda, (b) the extraordinary full-body search of defendant Miranda during which that

prolonged roadside stop, (c) the post-arrest searches of the vehicle's trunk and of Mr. Miranda's

suitcase or backpack found in that trunk, and (d) all statements made by him from the time he

was first placed in handcuffs until he was given full and complete Miranda warnings during

which time Mr. Miranda was subjected to improper custodial interrogation.

### INTRODUCTION

This case arises out of a prolonged traffic stop that included an extraordinarily intrusive

full body search of defendant Miranda, a black man from the Bronx, New York. Although Mr.

Miranda was a mere passenger in the vehicle, and there was no proper basis to suspect him of

misconduct, Mr. Miranda was subjected to a multi-officer, full-body search during which he was

handcuffed and suspected crack cocaine was found in his buttocks or anus. Although Mr.

Miranda specifically requested that the officers use body cameras to record their conduct,

discovery demonstrates that no body cameras were activated.  Although cruiser camera videos were provided, the officers positioned themselves to block much of the camera's view. Additionally, the audio recording is frequently inaudible.  Trooper Austin's report asserts that the audio was simply not working correctly.  But the recordings suggest the officers intentionally muted the audio recording to prevent a full record – or altered the recordings after they were created, that they warned one another of an "open mic" when anyone was being too candid, and that they intentionally turned away from the microphone at crucial moments.

It also appears that other officials have edited or caused the editing of the report of the officer who initiated the stop, Maine State Trooper Dana Austin.  Those edits were likely effected after the Hancock County District Attorney dismissed state charges against Mr. Miranda for "insufficient evidence."  At the time of the dismissal, Mr. Miranda had been detained for over a month in the Hancock County Jail.  A copy of the dismissal is attached hereto as **EXHIBIT A**.  It seems certain the detailed report produced in discovery in this matter was edited as a result of that dismissal because (a) the current version was not provided in the discovery in Mr. Miranda's now-dismissed state court case, (b) the report includes bizarre italicized passages in quotation marks, but in which no one is being quoted, (c) the report includes details that appear carefully placed to suggest that at the time of his intrusive seizure and search of Mr. Miranda Trooper Austin had detailed information about prior police activities, including information about other "New York" drug dealers whereas close reading of the report suggests Trooper Austin may have obtained that alleged information after the fact, and (d) the report includes subtle and implied assertions videos disprove.

State charges for possession of drugs seized from Mr. Miranda's buttocks or anus were dismissed for "insufficient evidence."  Almost certainly the phrase "insufficient evidence" in the

2

dismissal papers was code for "insufficient *admissible* evidence" – because of the clear violations of Mr. Miranda's constitutional rights.  Nevertheless, the federal government has now charged Mr. Miranda with essentially the same crime. The evidence should be suppressed, and the case should once again be dismissed.

## FACTUAL BACKGROUND

The facts surrounding the unconstitutional stop, arrest, search and interrogation include the following:

1.      Defendant Miranda was riding in a vehicle operated by Cody Look, travelling east bound on Route 1A in Dedham, Maine.

2.      The vehicle was stopped by Trooper Dana Austin, supposedly for loud exhaust.

3.      Trooper Austin's revised report includes odd provisions that are italicized and in quotation marks, even though those bizarre provisions purport to be written by Trooper Austin in the first person. One of those provisions is contained within paragraph 12 of the Trooper's revised report. It describes his observation of defendant Miranda as supposedly sitting in a reclined passenger car seat, with the quotation marks in place, as follow:

> "*While I have seen it before, it is uncommon for a driver or passenger to be reclined in a seat while a law enforcement officer is speaking to them. Typically, the driver or passenger usually put their seat up while speaking to me during a traffic stop.*"

4.      In fact, however, defendant Miranda had been seated upright, although he was difficult to see in the descending darkness.  Someone apparently encouraged Trooper Austin to add provisions to his report.

5.      It is apparent from the videos that defendant Miranda was respectful throughout. Over the extended period of his seizure he was never threatening, made no attempt or gesture toward any escape or was otherwise in appropriate.

6.      Promptly after Trooper Austin arrived, two other police vehicles arrived, carrying additional law enforcement personnel.

7.      During Trooper Austin's initial conversation with Mr. Look, Trooper Austin noticed that defendant Miranda had been rolling a marijuana "blunt." Defendant Miranda freely acknowledged that he had done so, displayed the blunt, and Trooper Austin in fact acknowledged that possession of the marijuana was fully legal.

8.      The reports suggest that what started as a routine traffic stop was prolonged because of suspicious behavior by the occupants developed rapidly.

9.      Although the videos are poor quality and the audio appears to have been manipulated, the videos are clear enough to suggest that a number of officers planned to attend, that they were on their way to the scene *before* the stop was initiated, and that the officers planned to and did carry out a bizarre, nearly gruesome road-stop search of Mr. Miranda.

**The Objective Truth**

The officers' vehicles created several cruiser-cams videos of the protracted seizure, searches and interrogations. The videos document that no aspect of the seizures or interrogations had anything to do with a loud exhaust, that the officers' assertions concerning their reasons for extending the seizures were not only pretextual, but based on false pretext, and that in fact the officers engaged in a series of pre-planned abuses of the defendant Miranda's rights.

From the videos it appears that Trooper Austin followed the vehicle being driven by Cody Look in which the defendant was a passenger for some distance – although his report

suggests Trooper Austin stopped the vehicle as soon as it went by with a loud exhaust.  Although Mr. Miranda was wearing a hooded sweatshirt in the cold November evening, he is visible during the interrogation of Mr. Look. He was not in a suspicious reclined position as the report asserts.

Much of the initial exchange between Officer Austin and the vehicle occupants cannot be heard.  At approximately 1 minute, 18 seconds after the stop[1], Mr. Look was told to get out of the vehicle. He was fully out of the vehicle by about a one minutes and thirty sections, and he was interrogated outside the vehicle.  During that interrogation no questions were asked about the car's exhaust system. Approximately two minutes after the vehicle was seized, but outside the view of the cameras, Mr. Look apparently was patted down for weapons.

By the time Mr. Look was ordered to get out of the car, a second officer approached the Look/Miranda vehicle and stood directly adjacent to the passenger door and Mr. Miranda, even though Trooper Austin had not communicated via his radio.  As Trooper Austin conversed with Mr. Look, that second officer opened the passenger door, leaned into the vehicle and appeared to speak at Mr. Miranda.

While the second officer appeared to interrogate Mr. Miranda, Trooper Austin, outside camera range, interrogated Look concerning his relationship with Mr. Miranda. Contrary to Trooper Austin's report, Mr. Look never "changed his story" concerning the relationship. Instead, after initially saying "I guess he's my friend's cousin", Trooper Austin asked, "Who's your friend?" Mr. Look immediately corrected the phraseology, "Tim's my cousin; it's his friend", promptly clarifying that Mr. Look was "taking him to my cousin."  The unusual report,

---

[1] The video playback does not display time, so counsel timed events on the video as best he could.

however, describes that first statement and the correction in distinct paragraphs with several other paragraphs in between.  And it describes the correction as a "change in story."

After Mr. Look clarified that Mr. Miranda was his friend's cousin, Trooper Austin falsely asserted, "you can't have weed in the car like that dude." Mr. Look responded accurately, "I thought it was legal to have; told him just can't smoke it." As Officer Austin surely knew, Mr. Look's description of Maine Law was precisely accurate. *See* 28-B M.R.S. §1501.

After falsely telling Mr. Look that possession of pot in a vehicle is illegal and asking him to stand by the front of the car, Trooper Austin approached the passenger side of the vehicle, leaned in and appeared to speak with Mr. Miranda, and the second officer stood next to Mr. Look. The conversation cannot be heard.

Approximately three minutes and forty-five seconds after the vehicle stop and after speaking with Mr. Miranda, Trooper Austin directed Mr. Look to lean on the front of his cruiser.

Approximately four minutes and thirty seconds after pulling the vehicle over and with other officers guarding Mr. Miranda, Officer Austin finally (and for the first time since the stop) radioed dispatch with the names of Messrs. Look and Miranda, emphasizing that Mr. Miranda is from New York.  At the time Mr. Look was still leaning on the hood of Trooper Austin's cruiser. Night had fallen, and the November chill was cold enough so that Mr. Look blew on his hands during the radio conversation, even though he was wearing what appeared to be a thick sweatshirt.

Nearly six minutes after the stop, Mr. Look was directed to come toward the back of Trooper Austin's vehicle, out of the view of the cruiser camera, and he was further interrogated. Some of the interrogation was captured on the audio, but it cannot be seen.

About six minutes after the stop, Trooper Austin asked whether there is anything he should know about in the vehicle.  Trooper Austin then declared that he had a canine coming to sniff the car, and asked whether anything would be found, even though no conversation requesting a canine could be heard up to that point.  Mr. Look responded that there will be no narcotics in the vehicle other than the pot, and he again stated (correctly) that he believed transporting the pot was lawful.

About seven minutes and thirty seconds after the stop, Trooper Austin can be heard (but not seen) telling Mr. Look that he is going to "put handcuffs on" him.  At about the same time a third officer not seen previously approached the passenger door so that two officers were guarding Mr. Miranda, who remained seated in the front passenger seat.  There is no indication in the video or any discovery that in the seven and a-half minutes that had expired Mr. Miranda had ever made any threatening or suspicious gesture.

As Trooper Austin says to Mr. Look (but again, out of the cruiser-cam video picture), "I'm going to put you in my cruiser; it's a little warmer in here," the third officer opens the passenger door of the Look/Miranda vehicle.  About eight minutes after the stop, the second and third officers who entered the video began to pat down Mr. Miranda.  As that search began, Trooper Austin could be heard saying he was going to "buckle up" the handcuffed Mr. Look.

Trooper Austin then joined the other two officers in what became a three-officer search of Mr. Miranda.  Although Trooper Austin's report refers to the search as a "pat down," it was no "pat down" as that term is traditionally understood – and certainly no "pat down" as the term was employed in *Terry v. Ohio*, 392 U.S. 1, 26, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).  The thorough search lasted several minutes.  After about twenty seconds of searching the front of Mr. Miranda's, the officers directed him to to turn around. At that point, two officers inserted their

hands into Mr. Miranda's buttocks. Although the officers' hand were outside Mr. Miranda's pants, Mr. Miranda could feel a hand pressing deep between his butt cheeks.  At that point, nearly nine minutes after the vehicle stop, and as the officers began to handcuff Mr. Miranda as he was being searched an officer can be heard to say, "there's something right there, dude." Mr. Miranda protested: "that's illegal" and asked what the "probable cause" was to arrest him.

Shortly thereafter on of the officers can be heard directing the handcuffed Mr. Miranda to "bend over" the trunk of the Look/Miranda vehicle.  Immediately thereafter one of the three officers shoved Mr. Miranda in the back, and officers lean heavily on him and pulled at him, appearing to physically spread his butt cheeks.

As one of the officers moved away, approximately 9:30 minutes after the stop, an officer said, "You've got dope in your ass."  Mr. Miranda said, "that's illegal, sir." An officer responded, "It's not illegal; I felt it."

About a minute later, a radio conversation between the officers and apparently a dispatch officer can be heard concerning the need to use "personal protective equipment" apparently for an even more invasive search of Mr. Miranda's anus.  Approximately thirteen minutes after the initial seizure, three officers forced Mr. Miranda again to bend over the trunk of the Look/Miranda vehicle.  One of the officers was wearing what appeared to be a gas mask.  The officers positioned themselves so that camera's view of him was blocked, but the officer reached deep into pants and buttocks, removed his hand and held up an object.

Throughout, the officers could be seen, but only occasionally heard, speaking at Mr. Miranda. No *Miranda* warnings were given, however.

After moving the handcuffed Mr. Miranda out of the view of the cruiser camera (and apparently placing him the backseat of a cruiser), officers conducted a thorough search of the

Look/Miranda vehicle, including opening the trunk and apparently searching containers in it. Shortly after that search, many minutes after the initial stop and seizure, an officer can be heard for the first time giving *Miranda* warnings apparently to Mr. Look, but outside the view of any camera.  Mr. Look was then further interrogated and denied knowledge of whatever object was removed from Mr. Miranda's anus.

Shortly thereafter, the officers resumed the search of the trunk of the Look/Miranda vehicle and the containers in it. The area being searched was outside hidden from view of (below the area depicted by) the camera.  But an officer can be seen shaking what appear to be containers or bags lifted from the trunk or something in the trunk.

During this time even more officers arrive.  Officers can be heard cautioning a third officer against speaking candidly. Specifically, after an inaudible exchange, and a cautioning hand gesture by one officer, he can be heard saying to an apparently more senior (three-striped) officer "you're on open mic." The officer who had given the warning, apparently Officer Austin, then offers to provide a "rundown" to the apparently more senior officer.  Trooper Austin then repositioned himself so that he was facing directly away from his cruiser and summarized the circumstances of the seizure, arrest and searches.  Most of the summary is inaudible.  The most reasonable interpretation of the video is that Trooper Austin or someone intentionally made the audio inaudible.  An officer, apparently Trooper Austin, said he had just "gone through the first one" and began "the second one," pointing into the trunk. The officers appeared to discuss whether the search should progress, and the officer probably is Trooper Austin asked whether he "should close this?" After an inaudible response, Trooper Austin closed the trunk.

Shortly thereafter, an officer admits he has not "read him *Miranda* yet." It appears a discussion of the stop, interrogation and searches, follows. Virtually all of that discussion is

9

inaudible, except that Trooper Austin can be heard admitting that he "pulled it back a little," apparently acknowledging that he had visually looked inside Mr. Miranda's underwear during the portions of the search that were shielded from view from the camera's view.

At various times, Trooper Austin appears to adjust something on his belt and something near his collar that affects the audio quality. And it appeared that, at important times, he turned off a microphone associated with video.

After a substantial delay, a canine sniff test of the vehicle commenced. The canine sniff test was negative. The next day, however, the officers searched the truck of the vehicle including two bags based on consent supposedly provided by Mr. Look. Discovery documents that the officers had been told one of the bags belonged to Mr. Miranda. His bag was searched without his consent, as was a locked box. It is unclear from discovery which bag contained the locked box.

**DISCUSSION**

I. *Assuming the stop was lawful, it was extended too long for the stated or any permissible purpose.*

The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose. *See Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction. *Rodriguez v. United States*, 135 S. Ct. at 1614. In short, absent reasonable suspicion to justify an extended

10

detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries. *Rodriguez v. United States*, 135 S. Ct. at 1615.  And an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. at 1615.

In *Rodriguez v. United States*, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." 135 S. Ct. at 1612 (alterations in original)(internal quotation marks omitted). There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents. *See* 135 S. Ct. at 1613. After "the justification for the traffic stop was 'out of the way,'" the officer, without permission from the driver: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs. 135 S. Ct. at 1613. "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." 135 S. Ct. at 1613. The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven-or eight-minute delay constituted an acceptable "de minimisintrusion on Rodriguez's personal liberty." 135 S. Ct. at 1614. The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." *Rodriguez v. United States*, 135 S. Ct. at 1614. *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605

(1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).

The seizure and search of Mr. Miranda were far longer and more intrusive that the stop in *Rodriquez*. The delay had nothing to do with the stated purpose of the stop. Indeed, Trooper Austin never undertook the steps an officer appropriately takes if his purpose is to warn or cite a driver for a defective muffler. This was, instead, from the moment it began, if not before, and unreasonably prolonged investigatory seizure and search that had nothing to do with a defective exhaust. It was intended to result in an extraordinary search of Mr. Miranda that had nothing to do with weapons or officer safety.

Any argument that a prolonged stop was justified because Mr. Look "changed his story" about his relationship with Mr. Miranda or because of differences in their statements is pretextual. Although Trooper Austin's report implies that Mr. Look changed his story after some consideration, the video makes clear that he simply misspoke when he described Mr. Miranda as his "friend's cousin," rather than his "cousin's friend." Mr. Look immediately corrected the statement. Similarly, the report makes much of a supposed discrepancy between saying the parties came from "Taco Bell" as compared to "Plymouth . . . near the Turnpike." But the distinction was not suspicious to a reasonable mind. First of all, Taco Bell *is* in or near Plymouth and it *is* near the Turnpike. Second, Mr. Miranda is reported to have held up the Taco Bell container, even though the report suggests it is his statement that they had been to Taco Bell that is doubted. Such "minor, insignificant, illusory, or reconcilable inconsistencies in a defendant's story are not probative of criminal activity." *United States v. Spears*, 636 F. App'x 893, 902 (5th Cir. 2016).

*II. The full-body, handcuffed, multi-officer search of Mr. Miranda violated the Fourth Amendment.*

*Terry*, *supra*, allows a pat down for weapons of an individual reasonably suspected of being armed and dangerous. The Supreme Court has allowed such brief "pat downs" of passengers in vehicles stopped for routine traffic matters *if* the pat down occurs in the time reasonably used to complete the routine traffic stop. But it remains the law that a pat down based on reasonable suspicion must be strictly limited to a search for weapons. *Terry v. Ohio*, 392 U.S. 1, 26, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Once the search goes beyond the protective search, it becomes invalid under *Terry* and all fruits will be suppressed. *Sibron v. New York*, 392 U.S. 40, 65-66, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968). Further, officers must use the least intrusive means possible to effectuate for *Terry* stop purposes. *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983); *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992).

Several aspects of this search, singularly and certainly in combination, violated *Terry and* rendered the search *unreasonable* within the meaning of the Fourth Amendment: (a) the delay before the supposed pat down; (b) that fact that Mr. Miranda was closely watched for several minutes before the pat down and made no threating or flight-suggesting movements or statements, (c) the number of officers involved, (d) the use of handcuffs during the supposed pat down, (d) the extraordinary length of the so-called pat down, (e) its extraordinarily intrusive manner, and (f) the fact that the offensive and intrusive tactics were used against – and only against – a black man. This last point warrants consideration: We would all be deeply offended if a white wife or girlfriend were subjected to such an intrusive, roadside full-body search falsely justified as weapons pat down. Frankly, a white woman would not be so subjected. Indeed,

13

although the pat down of Mr. Look was not captured on video it appears from the audio during that portion of the stop that the pat down of Mr. Look was brief and involved a single officer. Almost certainly it was a typical pat down for the kind of bulges that might be weapons.  The intrusion into Mr. Miranda's buttocks was entirely different.

In determining whether the use of handcuffs alone was unlawful, the Court should consider whether the police were "unreasonable courts consider whether safety required the use of handcuffs and whether it was unreasonable to fail to use less restrictive procedures to address any safety concerns.  *United States v. Sanders*, 994 F.2d 200, 206-07 (5th Cir. 1993).  While there are no per se rules about exactly when the use of handcuffs is reasonable during investigatory stops, many courts have found that the use of handcuffs during investigatory stops is unreasonable when a suspect poses only a remote threat of fight or flight.  *Brown v. Lynch*, 524 Fed. App'x. 69, 76 (5th Cir. 2013).  If a suspect is compliant, is not suspected of having committed a violent crime, and a *Terry* frisk has revealed that he is unarmed, the suspect only poses a remote threat of fight or flight. *See El-Ghazzawy  v. Berthiaume*, 636 F.3d 452, 457-59 (8th Cir. 2011) (handcuffing was unlawful when suspect was only suspected of committing a nonviolent crime and the circumstances did not otherwise justify the use of physical force because suspect was cooperative); *Lundstrom v. Romero*, 616 F.3d 1108, 1123 (10th Cir. 2010) (handcuffing violated the Fourth Amendment where suspect was cooperative and unarmed).  Mr. Miranda was fully compliant, never threatening, never made any attempt to or even any gesture towards escape.  At least three officers were present and Mr. Look was handcuffed and belted into the back of a police cruiser.  In short, this extraordinarily intrusive search, which began nearly ten minutes after a stop supposedly to investigate a loud muffler had

nothing to do with making sure Mr. Miranda did not use a weapon, had nothing to do with officer safety.  It was plainly unreasonable.

> ### III. The warrantless search of the vehicles trunk and of Mr. Miranda's bag violated the Fourth Amendment.

After Mr. Miranda and Mr. Look were both handcuffed and placed in police cruisers, Trooper Austin opened the car's trunk and began searching the containers in it, including a bag the discovery reflects belonged to Mr. Miranda.  That search was stopped.  Although Trooper Austin's report states that it was terminated so as not to interfere with canine sniff, the search was almost certainly terminated because Trooper Austin was told (correctly) that his search of the trunk and the containers in it were unconstitutional.

As the Supreme Court has explained, after *Arizona* v. *Gant*, 556 U. S. 332 (2009), the Fourth Amendment  permits searches of a car where the arrestee is unsecured and within reaching distance of the passenger compartment "or where it is reasonable to believe that evidence of the crime of arrest might be found in the vehicle."  *Riley v. California*, 573 U.S. 373, 385 (2014).  Neither Mr. Look nor Mr. Miranda were unsecured or within reaching distance of the vehicle and, before the canine search, the officers had no basis to search the trunk or the containers contained in it.  After the canine search, they of course had eve less basis.

Knowing this, they officers sought Mr. Look's consent to search the trunk and the containers, including Mr. Miranda's.  They did so.  The warrantless search was of course presumptively unreasonable, and it was in fact unreasonable.  Mr. Look did not have authority to search Mr. Miranda's bag, and the officers had not reason to believe (or an actual belief) that he had such authority.  Accordingly, any and all fruits from the search of Mr. Miranda's bag must be suppressed.

IV.  **Mr. Miranda's statements after he was handcuffed and before he was warned must be suppressed**

*Miranda v. Arizona*, 384 U.S. 436 (1966), of course, established procedural safeguards that must be satisfied before statements made during custodial interrogation may be admitted. With respect to custodial interrogation, the government must prove that the defendant knowingly waived his or her *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986).

The *Miranda* decision spoke directly to the potential for government manipulation of the interrogation process, as follows:

> … the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right to silence and to assure a continuous opportunity to exercise it, the following measures are required.  Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

*Miranda v. Arizona*, 348 U.S. at 444 – 45.

*Miranda* emphasized the value of defense counsel's presence in the interrogation process to reduce improper coercion, protect the agents from false claims, reduce risks of abuse and assure a more accurate record.  *Id*. at 470.

It is unclear from discovery whether the government contends Mr. Miranda made any statements after he was handcuffed that are admissible against him.  All such statements ought to

16

be suppressed, however.  He was plainly arrested or subject to the functional equivalent of arrest

from the time he was handcuffed.  Mr. Miranda also submits he was interrogated.  Some of the

questioning cannot be heard on the video.  As noted above, Mr. Miranda respectfully submits

that the evidence shows or will show that the interrogation, search and recording processes – if

not the recording itself – was manipulated.

### CONCLUSION

Defendant Miranda respectfully asks that the Court schedule an evidentiary hearing on

this motion, require the government to produce at or before the hearing the discovery he has

requested in a separate motion of even date and, following the hearing, suppress the fruits of the

seizure and searches described above and the statements made by defendant Miranda from the

time he was handcuffed.

**EXECUTED** at Portland, Maine, this 5th day of August, 2019.


/s/ Edward S. MacColl_____
Edward S. MacColl, BRN #2658
Attorney for defendant Jose Miranda


Thompson, MacColl & Bass, LLC, P.A.
P.O. Box 447
Portland, ME  04112-0447
(207)  774-7600
emaccoll@thomport.com


### CERTIFICATE OF SERVICE

I, Edward S. MacColl, attorney for Jose Miranda, do hereby certify that, on August 5,
2019, I made due service of the above document by electronically filing the same using the
Court's EM/ECF system.

/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658
Attorney for defendant Jose Miranda

**STATE OF MAINE**

☑ UNIFIED CRIMINAL DOCKET
☐ SUPERIOR COURT
☐ DISTRICT COURT

**A TRUE COPY**

Attest _Guy S. Harding_
**Clerk of Courts**

STATE OF MAINE

County: _HANCOCK_
Location: _ELLSWORTH_
Docket No: _CR-19-285_

_JOSE A. MIRANDA_
　　　Defendant
　　　　　v.

**DISMISSAL**
(M.R.U. Crim. P. 48(a))

Pursuant to Rule 48(a) of the Maine Rules of Unified Criminal Procedure the (District Attorney for Prosecutorial District ___7___) (~~Attorney General of the State of Maine~~) hereby dismisses the ~~indictment, information, complaint or count(s)~~ _____ thereof against the defendant for the following reasons:

1)　☐ Defendant has pled to other charges:
　　　_____
　　　　　　　　　　(docket number(s) and count(s))

2)　☐ Defendant has been indicted on this or a substituted charge:_____
　　　_____
　　　　　　　　　　(docket number(s) and count(s))

3)　☐ Witness unavailable.

4)　☑ Insufficient evidence.

5)　☐ Defendant is a juvenile.

6)　☐ De Minimis.

7)　☐ Court has found Defendant not competent to stand trial and has ordered that all charges against Defendant in this matter are dismissed.

8)　☐ Other
　　　_____
　　　_____

Date: _04/17/19_　　　　　　　　_____
　　　　　　　　　　　　　　(Asst.) District Attorney / ~~Attorney General~~

**TO BE COMPLETED IF DISMISSED DURING TRIAL:**

I, _____, defendant, consent to the filing of the foregoing dismissal.

Date:_____　　　　_____
　　　　　　　　　　　　　　Defendant

CR-123, Rev. 07/15　　　WHITE - original for Clerk;　YELLOW - Prosecutor's copy;　PINK - Defendant's copy



# Maine State Police
## Continuation Report

Incident #
19S019459

| Author | CODE NO |
|---|---|
| Trooper Dana L. Austin | 9214 |

## DETAILS OF INVESTIGATION:

19S019459
3/11/2019
1630 Hours (All times are considered to be an approximate)

1) I was traveling eastbound on the Washington Junction Road in Hancock. As I got to the intersection of Route 1, I noticed a black sedan turn up the Washington Junction Road.  The sedan had just pulled off Route 1. The vehicle appeared to have a malfunctioning exhaust system. The noise emitting from the exhaust was excessive and unusual. Based on my training, education, and experience I know that the noise emitting from this vehicle was noticeably louder than other sedans I have heard over my 6 years of Law Enforcement service. The registration on the sedan was Maine 187SU. It should be noted I was in a fully marked Maine State Police Ford Taurus which was equipped with a Watchguard video system. My video recording was acting properly, but when I reviewed the video after the stop and I discovered that the audio was fading in and out and not functioning properly.

2) I ran the registration on my mobile MDT, and I noticed that Trooper Jeffrey Taylor had stopped the same vehicle on 2/4/2019 in Jonesport. Trooper Taylor had stopped the vehicle for the defective exhaust. During the traffic stop on 2/4/2019, Trooper Taylor noted that the operator was Cody Look DOB ████████ out of Cutler Maine and the passenger was Troy Brooks DOB ██████ out of the Bronx New York. During the traffic stop in February Trooper Taylor learned that Cody had just picked Troy up in Jonesport and that he was taking him to a house in Calais. Trooper Taylor had stopped the vehicle for a defective exhaust system.

00002842

3) Through several interviews with concerned citizens and cooperating defendants in the last two years, I have learned that Jonesport, Calais and Cutler are three towns that frequently have drug dealers from New York, specifically from the Bronx coming to sell illegal drugs in them.

4) I obtained a driver's license photo of LOOK and determined that he was the one driving the above listed vehicle. I had a good look into the vehicle as it was light outside and I did not see anyone else in the vehicle.

5) I contacted Trooper Jeffrey Taylor who was familiar with LOOK. Trooper Taylor stated LOOK was a known drug runner. Based on my training, education, and experience I know that a "*Drug Runner"* is someone, usually an addict, who transports drug dealers from one place to another in exchange for money or illegal drugs. Trooper Taylor advised that LOOK was a drug addict and he was known for driving out of state drug dealers from one place to another.

6) At approximately 1700 hours, Trooper Caleb Mcgary was on the telephone with me when he met this vehicle on Route 1A in Holden. Trooper Mcgary advised that the vehicle had just gone by the Leadbetters store.

7) I contacted Trooper Jeremy Caron and Trooper Adam Gould to keep an eye out for the vehicle. Based on everything I had learned at this point, I felt that LOOK was headed to Bangor to possibly pick up a drug dealer. I believed LOOK was possibly heading to the Concord Bus station as there was a bus arriving at 1830 hours.

8) At 1850 hours, Trooper Adam Gould located the vehicle heading East on Route 1A in Holden. I set up near the intersection of Route 1A and the Upper Dedham Road. As I was waiting for the vehicle, I could hear a vehicle coming from the west that had a loud exhaust. I met the vehicle near G&M Market. I confirmed that this vehicle was Maine registration 187 SU. This was the same vehicle that I had witnessed LOOK driving earlier in the night. As the vehicle went past me, I could only see a male operator.

00002843

9) I pulled out behind the vehicle and activated my emergency blue lights and stopped the vehicle on the right shoulder on Route 1A in Dedham. I stopped the Subaru for Operating with a defective exhaust (title 29-A, sec: 1912).

10) As I was approaching the vehicle, I noticed a passenger sitting in the front passenger seat. The passenger had his seat reclined, out of sight so this is why I did not see him as they drove by.

11) I approached the operator and immediately recognized him as LOOK. I asked LOOK for his driver's license, registration, and proof of insurance. LOOK handed me all three documents. I asked the male passenger for his identification. The male passenger produced a New York identification card. I identified the male passenger as Jose Miranda DOB ████ out of the Bronx, New York. I explained to LOOK and MIRANDA the reason for the traffic stop. I noticed that MIRANDA had a marijuana "Blunt" in his lap. MIRANDA had loose marijuana all over his lap and I explained to him he could not smoke marijuana in a motor vehicle. MIRANDA apologized and stated he was not from around here. MIRANDA denied smoking in the vehicle. LOOK apologized for the marijuana and stated that MIRANDA did not know the laws in Maine.

12) As I was speaking with MIRANDA I noticed he was wearing a baggy sweatshirt and baggy sweat pants. MIRANDA remained reclined in the passenger seat. This appeared odd to me that MIRANDA would remain in this reclined seat position while he was talking to me. *"While I have seen it before, it is uncommon for a driver or passenger to be reclined in a seat while a law enforcement officer is speaking to them. Typically, the driver or passenger usually put their seat up while speaking to me during a traffic stop"*.

13) I asked LOOK to step out of the vehicle so I could speak with him. LOOK walked back on his own to the rear of my vehicle. I asked LOOK who the passenger was. LOOK replied "That is my friend's cousin." LOOK did not know MIRANDA but he stated he had picked him up just outside of Bangor. I asked LOOK specifically where he had picked up MIRANDA. LOOK replied " Plymouth".  LOOK advised he had picked up the passenger somewhere just off the interstate. I asked LOOK if he had ever met MIRANDA. He advised he had not. I asked LOOK

if he had stopped anywhere from when he picked up MIRANDA to when I had stopped him. LOOK advised he had not.

14) It should be noted that I had recently received information about a house in Plymouth from Trooper Jeremy Caron. I learned that a residence in Plymouth was selling illegal narcotics out of it. That address is right off interstate 95. Trooper Caron had further explained that a gang (The-Sex-Money-Murder gang) out of the Bronx New York was selling illegal drugs and at times were trading firearms for illegal drugs.

15) I asked LOOK who the friend was that had asked him to pick up MIRANDA. LOOK stated "my cousin is Tim and that guy is his friend". LOOK had changed his story from first telling me that the passenger was his friend's cousin to now telling me that "Tim" was LOOK'S cousin and that MIRANDA was his friend.  LOOK later advised me that "Tim" was TIMOTHY CATES DOB 5/10/1978. I am familiar with CATES and know that he owns a residence in Cutler and allows out of state drug dealers to sell drugs out of it. I had a cooperating defendant (CD) that had provided information about the "CATES" residence to me in the past few months. The "CD" has provided information in the past that has led to a felony level drug trafficking arrest. The "CD" stated that the CATES residence frequently housed out of state drug dealers from New York. This "CD" had provided drug information to me in the past and has proven to be credible. I asked LOOK where he was taking MIRANDA. LOOK replied, "Cutler"

16) I approached the passenger side of the vehicle and asked MIRANDA what the operators name was. MIRANDA advised he did not know. I asked MIRANDA how he knew the driver. MIRANDA advised they were friends. I asked MIRANDA where the driver was taking him to. MIRANDA replied, "Jonesport". I know that Jonesport and Cutler are about an hour from each other. I asked MIRANDA where he was coming from. MIRANDA replied, "Taco Bell". Based on the extremely inconsistent stories, I believed that criminal activity was taking place. Specifically, I felt that there was a potential that illegal drug trafficking was taking place. Based on the following facts and circumstances, I had reasonable articulable suspicion to hold the vehicle and request a drug canine based on the following:

00002845

- Different accounts of where MIRANDA and LOOK had been coming from. I.E. LOOK stating that they were coming from Plymouth and MIRANDA stating there were coming from Taco Bell.
- Different account of where MIRANDA and LOOK were heading to. I.E. (LOOK stating he was taking MIRANDA to Cutler and MIRANDA telling me LOOK was taking him to Jonesport)
- "I had personal knowledge that LOOK was involved with illegal drugs". This is documented in our files.
- MIRANDA not knowing LOOK'S name even though MIRANDA stated they were friends.

  *"Based on my training, education, and experience, the above knowledge I have listed above is all indicative of criminal activity and drug trafficking. I have stopped thousands of vehicles in my career and I know that individuals who engage in criminal activity and drug trafficking will most of the time give different answers of what you ask them, compared to other people in that vehicle, because they do not want you to know what they have been doing".*

17) I returned to LOOK and explained to him that I was calling a drug canine to respond to the scene. I asked LOOK if there was anything illegal on him or in the vehicle. LOOK advised there was nothing in the vehicle and then stated, "Not that I am aware of." I was advised that Trooper Jeffrey Taylor would be enroute to the scene but that it would be a bit before he could get there. Trooper Taylor would be coming from Addison which is about 1 hour from Dedham.

18)  I advised LOOK I was going to pat him down for weapons. LOOK was checked for weapons and then handcuffed and placed in the front seat of my police cruiser. I checked LOOK for weapons as I did not want to put him in my police cruiser without first checking him for weapons. I placed LOOK in handcuffs for officer safety reason as he was being put in my police cruiser and left unattended. Trooper Gould and Trooper Jeremy Caron had asked MIRANDA to exit the vehicle. Trooper Gould had asked MIRANDA if he could check him real quick for weapons. MIRANDA responded by lifting up his arms. Trooper Gould asked MIRANDA again if he had any weapons. MIRANDA responded "No" I approached MIRANDA as Trooper Gould

00002846

had already begun checking MIRANDA for weapons. MIRANDA had lifted his arms in the air and was allowing us to check him for weapons. I believed MIRANDA had consented to a check for weapons because he had lifted his arms up in the air and I thought he was implicitly complying with our request to check him for weapons. (I learned after the traffic stop about Trooper Gould asking MIRANDA for consent to check him for weapons). I assisted Trooper Gould in checking MIRANDA for weapons. It should be noted that MIRANDA was wearing baggy sweatpants and a baggy sweatshirt. Based on my training, education, and experience, I know that people wearing loose clothing often times wear several layers (I.E. Long Johns, Spandex, and under shorts). By wearing several layers, this allows for a weapon to be held tight against their body, specifically in the area of the groin and legs. As I began checking the waist region of MIRANDA, which is a common place to conceal weapons, I located a hard-ridged object just below his back line. The object was located on the right side of Miranda's buttocks. The object was not in his buttocks but it was to the left side of his right butt cheek. I could tell that the object was not part of the human anatomy. Based on my training, education, and experience I immediately recognized that the object was illegal narcotics. The object was hard and it looked and felt like a rock like substance which is common with Crack Cocaine. I asked MIRANDA what the object was that I was feeling. MIRANDA replied "Nothing".

19) I pulled back the sweat pants that MIRANDA was wearing and could see a condom, wrapped with toilet paper and a white rock-like object showing just below the waist line. Based on my training, education, and experience I identified the object as Crack Cocaine. MIRANDA was wearing tight boxer briefs and I grabbed onto this at the same time I pulled back his sweat pants. The white rock-like object was being held in place from the pressure of the boxer briefs pressing on it, and that in return was pushing it up against MIRANDA'S skin. Based on my training, education, and experience I know that drug traffickers will transport illegal drugs by using condoms. Drug traffickers will insert the illegal drugs into condoms and then insert them into their vagina or anus.  I went back to my police cruiser and retrieved my personal protective equipment. I removed the suspected illegal narcotics from the buttocks region of MIRANDA. I put on latex gloves and pulled the package out. The package consisted of one condom containing three separate individual baggies containing the white rock-like substance. Two of the packages inside the condom were outside the buttocks, and one was partially between the left and right

butt cheek. Due to officer safety reasons, I did not further examine the illegal narcotics on the side of the road. The illegal narcotics were placed into an evidence bag and secured in my police cruiser. I later performed a TruNarc test on the suspected narcotics.

20) MIRANDA told me he would cooperate with this investigation. I had Trooper Caron place MIRANDA in his police cruiser. I contacted the on call MDEA Agent which was S/A Christopher Smith. I explained the case facts to S/A Smith and he advised he would contact his supervisor SS/A Christopher Thornton and get back to me.

21) I read LOOK the Miranda warning that I located online and he agreed to speak with me. This occurred in the front seat of my police cruiser. LOOK stated he had been paid an amount of money to go pick up MIRANDA. I did not ask LOOK any more questions because other officers had arrived on scene to assist.

22) Sergeant Jason Sattler, Sergeant Alden Bustard, and Deputy David Lord of the Hancock County Sheriff's Office arrived on scene to assist and I advised everyone of what I had.

23) Trooper Gould and myself began searching the vehicle. I began searching the trunk of the vehicle when I was advised that Deputy Ryan Allen of the Washington County Sheriff's Office would be responding to the scene from Route 9. Deputy Allen had a drug certified canine.  I had just finished up searching one back pack and was about to start searching the next one. I stopped searching the vehicle as I did not want to disturb anything inside of it for the canine.

24) Deputy Ryan Allen arrived on scene and utilized his canine for a drug sniff on MIRANDA and LOOK. Deputy Allen advised me his dog had alerted on MIRANDA. Deputy Allen stated his dog did not indicate on the vehicle. At this point, Dave's Towing was contacted to remove the vehicle. Deputy David Lord stated he would transport MIRANDA to the Hancock County Jail for me. Prior to the transport to the jail, Trooper Jeremy Caron had read MIRANDA his Miranda rights. Trooper Caron advised that MIRANDA stated the substance we located was not Heroin or Fentanyl, but he would not admit to the substance being Crack Cocaine.

25) I spoke with LOOK inside my police cruiser, and asked if he would talk to me about what was really going on. LOOK stated he would and that he did not want to go to jail. I asked LOOK to tell me again how he ended up picking up MIRANDA. LOOK stated that "Tim" had a friend who paid him $150.00 to go pick up MIRANDA and take him to Cutler. LOOK stated that MIRANDA was delivering "stuff" to a guy in Cutler. I asked LOOK who the guy was. LOOK stated his street name was "C".

26)  I asked LOOK again if he knew that MIRANDA had illegal drugs on him. LOOK stated "yes". I asked LOOK if it was Crack Cocaine. LOOK replied, "yeah and probably Heroin". LOOK stated he had left Cutler around 12-1:00 P.M. to go pick MIRANDA up. LOOK stated that MIRANDA and "C" were cousins and that LOOK was taking MIRANDA to meet up with "C".

27) I spoke with LOOK about the defective exhaust. LOOK stated he knew the vehicle was not road legal and that the exhaust had been leaking for a few weeks.



.



Page 9 of 10

00002850

38) On March 12, 2019, I spoke with SS/A Christopher Thornton and advised him of the updated information about the backpack left in the car and that it had not been searched. SS/A Thornton advised S/A Jacob Day would type up a search warrant for the vehicle.

39) I later spoke with S/A Jacob Day who advised he had located a handgun in the backpack that had not been searched. S/A Day took possession of the firearm and placed the handgun it into his custody.

**ENCLOSURES:**

**-Trooper Jeremy Caron Report**
**-Trooper Adam Gould Report**
**-Deputy Ryan Allen Report**
**-DVD copies**
**-Triple III**

**SBI/III INFORMATION DISSEMINATED TO:**

**RECOMMENDATION:**

**This case can be closed out as an arrest.**

00002851

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Docket No. 1:19-cr-118-LEW |
| | ) |
| JOSE MIRANDA | ) |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through its undersigned counsel, hereby responds in opposition to Defendant Jose Miranda's Motion to Suppress (ECF No. 52).  For the reasons set forth below, the motion should be denied.

### ANTICIPATED FACTS

On March 11, 2019, at approximately 4:30 p.m., Maine State Police (MSP) Trooper Dana Austin was on patrol in Hancock, Maine.  At this time, he identified a vehicle operating with an excessively loud exhaust system.  Trooper Austin believed the exhaust system was malfunctioning.  A query of the license plate revealed that MSP stopped this same vehicle on February 4, 2019, also for operating with a defective exhaust.

After making this initial observation, Trooper Austin learned that law enforcement intelligence indicated the operator of this vehicle on February 4, Cody Look, was engaged in transporting drug traffickers.  Suspecting that Look was traveling to Bangor to pick up a drug trafficker, MSP elected to let the vehicle go and look for in on the return trip.  At approximately 6:50 p.m., troopers located this same vehicle as it proceeded east on Route 1A in Holden.  Trooper Austin stopped the vehicle for the defective exhaust.

Trooper Austin identified the operator of the vehicle as Cody Look by his Maine driver's license.  The passenger presented a New York identification card identifying him as Defendant

1

Jose Miranda.  Trooper Austin observed the defendant had a marijuana blunt and loose marijuana in his lap.

When questioned, Look claimed he picked up the defendant off the interstate.  He said he had never met him.  Look initially stated that the defendant was his friend's cousin.  He later identified the defendant as his cousin's friend.  Look identified his cousin as Timothy Cates.  Trooper Austin was familiar with Cates as a Cutler resident who permitted drug traffickers to operate out of his residence.  Look confirmed he was taking the passenger to Cutler.

Trooper Austin approached the passenger's side of the vehicle to speak with the defendant.  In response to questions, the defendant was unable to identify the driver by name.  He said he and the driver were going to Jonesport.  The defendant stated they were coming from Taco Bell.

Based on the inconsistent stories and Look's suspected involvement with narcotics trafficking, Trooper Austin elected to continue his investigation.  He called for a drug-detecting canine.  Other officers also arrived on the scene.

Prior to the arrival of the canine, Trooper Austin conducted a pat down of Look with negative results for weapons.  Look was placed in a police cruiser.

Trooper Gould asked the defendant to step out of the vehicle.  He next asked the defendant for his consent for a weapons check.  The defendant responded by raising his arms.  The defendant was wearing baggy sweatpants and a baggy sweatshirt.  During the pat down, Trooper Austin felt a hard object below his back line.  Trooper Austin immediately recognized the item as a package of narcotics.  When asked what it was, the defendant responded, "Nothing."

2

Trooper Austin then pulled back the defendant's sweatpants and observed a condom wrapped with toilet paper. The item was held against the defendant's skin by his underwear. Trooper Austin retrieved latex gloves and removed the package from the defendant's buttocks area. The condom contained three separate baggies with a white rock substance.

The canine then arrived on scene. It alerted for the presence of narcotics on the defendant. It did not alert on the vehicle. The vehicle was then towed and searched. The search revealed a firearm in a backpack.

DISCUSSION

1. *The Traffic Stop Was Lawful and Was Not Unduly Prolonged*

The defendant does not expressly challenge the legitimacy of the stop, but rather what happened after the stop.[1] During a routine traffic stop, beyond determining whether or not to issue the driver a warning or a traffic ticket, an officer's tasks include "ordinary inquiries incident to the stop." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). *See also United States v. Dion*, 859 F.3d 114, 124 (1st. Cir. 2017). It is well-settled in this circuit that questions about a driver's itinerary, even if unrelated to the reason for the stop, are permissible. *Id.*; *United States v. Dunbar*, 553 F.3d 48, 56 (1st Cir. 2009). At all times during a traffic stop, the investigatory actions taken by the officer must be "reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *United States v. Ruidíaz*, 529 F.3d 25, 28-29 (1st. Cir. 2008) (citations omitted).

The reasonableness analysis "requires a practical, commonsense determination," *Id.* at 29, which "entails a measurable degree of deference to the perceptions of experienced law

---

[1] The stop was clearly lawful based on a traffic violation. Even if it was a pretext stop, it was entirely lawful. *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011) ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else.").

3

enforcement officers." *Id.* (*citing Ornelas v. United States*, 517 U.S. 690, 699(1996). "As an investigation unfolds, an officer's focus can shift, and he can 'increase the scope of his investigation by degrees' when his suspicions grow during the stop. *Dion*, 859 F.3d at 125 (citing *Ruidíaz*, 529 F.3d at 29 (additional citations and quotations omitted). "Indeed, 'the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess.'" *Id.* (*citing Terry v. Ohio*, 392 U.S. 10 (1967)). Therefore, if an officer expands a routine traffic stop based on a reasonable suspicion that the occupants of the vehicle are engaged in more serious criminal activity, the expansion is justifiable. *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998).

Reasonable suspicion does not require probable cause or evidence of a direct connection between the suspect and the crime. *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). The standard also "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The presence of reasonable suspicion must be assessed in a common-sense way, taking into account the totality of the circumstances. *Dion*, 859 F.3d 124. When determining if reasonable suspicion existed, the facts cannot be looked at in isolation, in a sort of "divide-and-conquer" way, but instead must be considered in the aggregate. *Dion*, 859 F.3d at 125; *Rudiaz*, 529 F.3d at 30.

Both the stop itself and the period of the stop were authorized in this case. Prior to the stop, law enforcement developed information that Cody Look and Timothy Cates were alleged to be engaged in multi-state drug trafficking. During the stop, Trooper Austin located marijuana in the defendant's lap. Look claimed he had never before met the defendant. He stated the defendant was Cates's friend. The defendant was unable to identify Look. Each gave differing accounts of where their trip started. The provided differing destinations. Therefore, as the stop

unfolded, Trooper Austin's reasonable suspicion that the defendant was involved in criminal activity continued to grow.  Taken in the aggregate, these facts indicate that a reasonable suspicion existed that the defendant was involved in some sort of criminal activity, which justified the pat frisk. Accordingly, the limited expansion of MSP's investigation was supported by reasonable suspicion and is justified.

   2.   *The Seizure of Contraband from the Defendant was Lawful*

   The defendant contends that the pat down that led to the discovery of the cocaine base filled condom concealed below his back was a violation of his Fourth Amendment rights.  This claim fails.  Based on the information available to the officers at the time, the decision to pat down the defendant for safety purposes was amply supported by reasonable articulable suspicion.

   Vehicle stops are "especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), and such danger is presented not simply by the driver but also any other occupants of the vehicle.  *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997).  Such risk "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop."  *Id.* at 414. "[T]he motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver."  *Id.*  In recognition of the dangers posed by traffic stops, law enforcement officers are permitted to order the driver and any passengers out of the vehicle until the traffic stop is complete, *see Wilson*, 519 U.S. at 415 *and Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977), and may frisk a vehicle occupant for weapons when reasonable suspicion exists that he or she may be armed and dangerous.  *Arizona v. Johnson*, 555 U.S. 323; *United States v. Tiru-Plaza*, 766 F.3d 111, 115-16 (1st Cir. 2014).

To summarize the suspicious facts known to MSP at the time of the pat down: (1) Look was suspected to be involved in transporting drug traffickers; (2) Look linked the defendant to Timothy Cates, who was also suspected of being involved in interstate drug trafficking; (3) the defendant and Look had no prior connections; (4) the defendant and Look provided differing points of origin and differing destinations; and (5) the defendant had marijuana in his lap.

Based on the foregoing, troopers elected to conduct a pat down of the defendant for safety. Such a frisk was wholly justified based on the facts known to the officers. Thus, the officers were well within the boundaries of the Fourth Amendment in conducting a safety frisk. *See Johnson*, 555 U.S. 323 at 333-34; *Chaney*, 584 F.3d at 26.

Trooper Austin immediately identified the presence of a narcotics package during the pat down. The "plain feel" doctrine allows an officer to seize an object during a lawful pat frisk "if its incriminating character is immediately apparent." *United States v. Schiavo*, 29 F.3d 6, 9 (1st Cir. 1994). "The plain feel doctrine does not, however, permit an item to be seized if its incriminatory nature only comes to light after further inquiry or search, such as 'squeezing, sliding [or] otherwise manipulating the contents of the defendant's pocket.'" *United States v. Henry*, 827 F.3d 16, 27 (1st Cir. 2016) (*quoting Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). Based upon the immediate identification of the incriminating nature of the package, the troopers made a lawful seizure.[2]

For the foregoing reasons, the contraband seized from the defendant should be admitted at trial.

---

[2] The Government disputes the defendant's characterization of the seizure. The video speaks for itself.

3.  *The Search of the Vehicle was Based on Probable Cause*

Based on all of the above, there was clearly probable cause to search Look's vehicle. Trooper Austin observed marijuana in the vehicle.[3]  Police seized a large amount of suspected crack cocaine from an occupant.  The canine alerted on the defendant.  The negative canine sniff of the vehicle did not negate probable cause developed by MSP.

The Supreme Court has explicitly stated that "the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Cal. v. Acevedo*, 500 U.S. 565, 580 (1991); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.")

The scope of the search that followed, including the search inside the backpack, was within the scope of the "automobile exception" to the warrant requirement. *See United States v. Le*, 377 F. Supp. 2d 245, 252 (D. Me. 2005) ("The automobile exception allows 'a probing search of compartments and containers within the automobile.'") (*quoting Cal. v. Acevedo*, 500 U.S. 565, 570 (1991)). The fact that the search occurred away from the location of the traffic stop lot did not invalidate the basis for the search. *United States v. Lopez*, 380 F.3d 538, 545 (1st Cir. 2004) ("The government has presented ample evidence demonstrating that law enforcement officers had probable cause to search the vehicle and the compartment. The relocation of the vehicle from the parking lot to the police station did not deprive the officers of probable cause to search."); *United States v. Panitz*, 907 F.2d 1267, 1272 (1st Cir. 1990) (a warrantless search of a vehicle "need not be conducted contemporaneously with the seizure" and is not limited "temporally [or] spatially") (internal quotation marks omitted); *United States v. McHugh*, 769 F.2d 860, 865 (1st Cir. 1985) (search of

---

[3] Observations of non-criminal amounts of marijuana support a search pursuant to the automobile exception.  *See, e.g., United States v. Robbins*, 2016 U.S. Dist. LEXIS 153558, 2016 WL 6565922 (S.D. Cal. Nov. 3, 2016).

vehicle seven days after impoundment and initial look in back of vehicle reasonable because probable cause to search at time of seizure); *United States* v. *Donahue*, 764 F.3d 293, 297, 300-01 (3d Cir. 2014) (search of closed bags inside car after five days of impoundment and two inventory searches reasonable because deputy marshals had probable cause to search car at time of seizure); *United States v. Adams*, 2016 U.S. Dist. LEXIS 163986, at *5-6 (D. Me. Nov. 29, 2016).

The search was lawful based upon probable cause, regardless of whether Look had the authority to consent to the search of the items in the trunk.

4. *The Alleged* Miranda *Violation is Moot*

The Defendant seeks to suppress statements made after he was handcuffed but before he was advised of his *Miranda* warnings.  The Government does not intend to offer any such statements.  Statements made prior to discovery of the contraband and after law enforcement provided *Miranda* warnings do not appear to be challenged and should nonetheless be admitted.

## <u>CONCLUSION</u>

Wherefore, the Government requests that this Court to issue an order denying the Defendant's Motion to Suppress.

Dated this 20th day of September, 2019.

Respectfully submitted,

Halsey B. Frank
United States Attorney

/s/David B. Joyce
Assistant U.S. Attorney
United States Attorney's Office
100 Middle Street
Portland, ME 04101
david.joyce@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2019, I filed the foregoing Response using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

/s/David B. Joyce
Assistant U.S. Attorney
United States Attorney's Office
100 Middle Street
Portland, ME 04101
david.joyce@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
UNITED STATES OF AMERICA          .
                                  .
    v.                              .
                                  .          **1:19-cr-00118-LEW**
JOSE MIRANDA,                     .
                                  .
          **Defendant.**          .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DEFENDANT MIRANDA'S REPLY MEMORANDUM**
**IN SUPPORT OF MOTION TO SUPPRESS**

Defendant Jose Miranda respectfully submits the following reply to the government's

Objection to his Motion to Suppress, focusing on three issues:

1.      The supposed "pat-down" of defendant Miranda was improper, including because

of its intrusiveness and because the officers' purpose was to discover evidence, and not for

protection;

2.      The so-called "plain feel" exception did not properly apply both because (a) the

officers' immediate conclusion that something "hard" must be narcotics reveals more about their

objective (i.e. finding evidence) than it does about a rational identification of what they felt, and

(b) the fact that an object is "hard" does not "plainly" identify it as narcotics – unless the place

searched would be used to hide nothing but narcotics; and

3.      The government has not explained, either by evidence or citation to caselaw, how

they had "probable cause" to search the trunk of a car and containers within it merely because an

occupant had possessed narcotics, *even after* a canine search for narcotics was positive as to the

individual, but negative as to the vehicle.

DISCUSSION

**I.      The Government's Argument - and the Evidence - Demonstrate the Supposed Pat-Down was a Search for Evidence, Not Safety.**

The government argues, on the one hand, that the officers conducted a pat-down of the area between defendant Miranda's butt cheeks for the permissible purpose of assuring their safety, but that, on the other hand, as soon as an officer felt something hard between Mr. Miranda's private area, they knew the object must be narcotics, allowing them to reach inside his underwear under the "plain feel" doctrine.  Thoughtfully considered, the government's argument effectively concedes - and the evidence demonstrates - that the pat-down was not a proper weapons frisk allowed under *Terry*, but instead a search for evidence.  Had the officers been searching for weapons, upon feeling something "hard" they would have contemplated that it might be a weapon.  They did not – because they were feeling for narcotics in a place they expected to find nothing else.

The government does not dispute that a *Terry* stop allows only "a pat-down search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993), *quoting Terry v. Ohio*, 392 U.S. 1, 24 (1983). Of course, "the purpose of this limited search is *not to discover evidence of crime*, but to allow the officer to pursue his investigation without fear of violence… ." *Minnesota v. Dickerson*, 508 U.S. at 373, *quoting Adams v. Williams*, 407 U.S. 143, 146 (1972)[*emphasis* added].  Accordingly, the pat-down "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Minnesota v. Dickerson*, 508 U.S. at 373, *quoting Terry*, 392 U.S. at 26. "If the protective search goes beyond what is necessary to determine if the

2

suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. at 373, *citing Sibron v. New York*, 392 U.S. 40, 65-66 (1968).

Although the government asserts in footnote 2 that it "disputes the defendant's characterization of the seizure," the government identifies no aspect of the defendant's detailed description as inaccurate. And, indeed, a number of incontrovertible facts about the supposed safety "pat-down" of defendant Miranda for weapons demonstrate that the pat-down from the offset was a search for evidence, and was not motivated by or designed for safety:

1. The officers kept defendant Miranda under close observation for approximately seven minutes before beginning their intrusive search;

2. Multiple officers were involved in the supposed pat-down;

3. The pat-down was unusually intrusive, including the area between defendant Miranda's butt cheeks;

4. Officers would not ordinarily expect to find a weapon in that area; and

5. As soon as the officers felt something hard, they immediately concluded it must be narcotics, disclosing that that is what they expected to find – not a weapon, which presumably would also be "hard."

## II.     The "Plain Feel" Doctrine Does Not Apply.

For the reasons outlined above, a *Terry* "pat down," an unobtrusive check for weapons and not evidence, must be limited to the extent needed for that purpose.  It must, therefore, be "limited to the suspect's outer clothing."  *E.g., Jeans v. Varga*, 2019 U.S. Dist. LEXIS 171401 (N. D. Ill. 2019), *citing Minnesota v. Dickerson, supra*; *Adams v. Williams, supra* and *Terry v. Ohio.*  The government does not dispute that limit, but contends that once the officers felt something hard, they could and did – without more and without "squeezing sliding or otherwise

manipulating" – identify the hard object as narcotics and could therefore search within Mr. Miranda's underwear under the "plain feel" doctrine, citing *United States v. Henry*, 827 F.3d 16, 27 (1st Cir. 2016).  Significantly, in *Henry* the defendant had *not* challenged the district court's finding that upon feeling a wad of paper within a suspect's pocket the officer immediately concluded the paper was drug proceeds.  Defendant Miranda absolutely disputes the government's assertion that upon feeling "something hard" the officers could or did know what it was – just as though it were in "plain view."  Indeed, as explained above, defendant Miranda respectfully submits that the officers' immediate conclusion tells much more about what the officers were trying to find (evidence of a crime), than about the actual identity of what they felt.

### III.    The Officers Did Not Have Probable Cause to Search the Vehicle or the Containers in its Trunk.

The government has provided no explanation for how the officers had probable cause to search the truck of a car and the containers within it after a canine search revealed that there were no narcotics in the car.  The government has provided no explanation for why the officers would have (or even contended that they did) doubt the results of the canine search.  The canine had alerted to defendant Miranda, from whom suspected narcotics had already been seized, but not to the car.

The officers' conduct shows they doubted, even before the canine search, that they had a proper basis to search the trunk or containers within it.  That obviously is why a senior officer terminated a junior officer's pre-canine-search inspection of the trunk and the bags contained in it.  The officers correctly believed they should wait and see what a less intrusive canine search revealed.  But the negative canine search obviously did not provide the missing components of probable cause.  To the contrary, probable cause requires consideration of the totality of the

4

circumstances.  By the time of the warrantless search, the officers knew the canine had not alerted to the vehicle's trunk.  Because they lacked probable cause, the search was improper.

## CONCLUSION

For all of the foregoing reasons and for the reasons set forth in the Motion, the Motion to Suppress should be granted.  Defendant respectfully submits, however, that an evidentiary hearing is required, including in particular on the question whether the search was limited to, and was for the purpose of, finding weapons.

EXECUTED at Portland, Maine, this 8th day of October, 2019.


/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658
Attorney for defendant Jose Miranda


Thompson, MacColl & Bass, LLC, P.A.
P.O. Box 447
Portland, ME  04112-0447
(207)  774-7600
emaccoll@thomport.com


## CERTIFICATE OF SERVICE

I, Edward S. MacColl, attorney for Jose Miranda, do hereby certify that, on October 8, 2019, I made due service of the above document by electronically filing the same using the Court's EM/ECF system.

/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658
Attorney for defendant Jose Miranda

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| **UNITED STATES OF AMERICA** | . |
| | . |
| **v.** | . |
| | . |
| **JOSE MIRANDA,** | . |
| | . |
| **Defendant.** | . |

**1:19-cr-00118-LEW**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DEFENDANT MIRANDA'S POST-HEARING MEMORANDUM**
**IN SUPPORT OF MOTION TO SUPPRESS**

Defendant Jose Miranda respectfully submits the following post-hearing memorandum, focusing on the following issues:

1.      The record evidence establishes that Mr. Miranda was not subjected to a mere routine safety patdown, as the government mistakenly contends;

2.      The record evidence establishes that the evidence seized from Mr. Miranda was, to use Trooper Austin's words, "in [Mr. Miranda's] ass," and was not protruding from the outside of Mr. Miranda's butt cheek;

3.      The nature of the item felt through several layers of clothing and packaging was not immediately apparent; instead, the officers probed and questioned for a significant period of time before concluding that Mr. Miranda had "dope in your ass."

4.      The bag Mr. Miranda placed in the trunk of Cody Look's vehicle was searched without Mr. Miranda's consent and without any warrant;

5.      Mr. Miranda had a reasonable expectation of privacy in that bag; and

6.      It was searched at a time neither Mr. Miranda nor anyone else other than law enforcement officials had access to the bag.

Filed herewith are the following documents that support Mr. Miranda's contentions:

a)      A detailed timeline summarizing the evidence captured on the cruiser cam videos from Trooper Austin's cruiser (Gov. Ex. 1) and Trooper Gould's cruiser (Gov. Ex. 2) submitted into evidence (**EXHIBIT A**);

b)      A still from 10 minutes, 9 seconds into the Trooper Austin cruiser camera video showing officers reaching underneath Mr. Miranda's outer clothing at the start of the search of her person (**EXHIBIT B**);

c)      A still from 10 minutes, 36 seconds into the Trooper Austin cruiser camera video showing the three officers participating in close quarters in the search of Mr. Miranda's person (**EXHIBIT C**);

d)      A still from 15 minutes, 21 seconds into the Trooper Austin cruiser camera video showing the package the officers moments earlier seized from  Mr. Miranda's person (**EXHIBIT D**);

e)      A Declaration from Mr. Miranda confirming that he placed his personal bag in the trunk of Mr. Look's vehicle and did not consent to any search of that bag (**EXHIBIT E**); and

f)      A still photograph produced as supplemental discovery on January 21, 2020 of the package depicted in Exhibit D (**EXHIBIT F**).

## DISCUSSION

**I.      The Seizure of Mr. Miranda was not a routine traffic stop, nor was the search of his person a frisk for weapons**

As argued in defendant Miranda's motion to suppress and reply memorandum and in defendant Look's Memorandum of Law in Support of Motion to Suppress (Doc. 89), routine traffic stops and warrantless pat-downs for weapons allowed under *Terry* both must be strictly

limited to the purpose for which they are permitted by Supreme Court precedent, and the government bears the burden of proving such warrantless searches and seizures were so limited. In this case, however, the detailed timeline included as **EXHIBIT A** (which simply states verbally what the videos admitted into evidence as government Exhibits 1 and 2 documented) and the balance of the hearing evidence made clear that the stop of the Miranda vehicle was not a routine traffic stop for a loud exhaust, nor was Mr. Miranda subjected to a routine weapons pat-down. Instead, from the outset, the officers were investigating a hunch that Mr. Look's passenger might be transporting narcotics "in his ass."  After several officers had arrived, they eventually searched for and found the suspected drugs where their hunch suggested they might be hidden. But because the stop and search were not limited as the Constitution requires, the evidence must be suppressed.

The record evidence demonstrates that this was never a stop for a loud exhaust.  Although pretextual stops may be constitutional if limited in accordance with the pretext, this vehicle stop was not so limited.  Rather than conduct a routine traffic stop, Trooper Austin delayed so that pre-planned back-up could arrive and participate in the seizure and a search for narcotics.

The following details from the timeline and testimony document this was no routine traffic stop:

Multiple officers were on the lookout for the Look vehicle, even though they had no information about it, other than its loud exhaust and a tip about Mr. Look's potential role as a transporter of drug dealers.  Trooper Austin pulled the vehicle over, approaching the driver's side one minute, twenty-nine seconds into the video.  His conversation with the occupants from 1:29 through 2:36 is not recorded, but Trooper Austin noted that the passenger, defendant Miranda, had marijuana, including a blunt, in plain view.  Mr. Miranda did nothing to hide the marijuana.

3

Although Trooper Austin knew possession and transporting the marijuana was legal, he nevertheless (likely trying to cause the Messrs. Look and Miranda to become nervous) falsely asserted the possession was illegal. Significantly, Troopers Austin and Gould acknowledged and the videos document that neither Mr. Look nor Mr. Miranda ever appeared or sounded nervous. Neither ever made any threatening gesture or gave any hint of flight. Instead, as the officers acknowledged, both occupants were cooperative, respectful and appropriate throughout.

At 2:37, Trooper Austin directed Mr. Look to exit the vehicle, and he signaled another officer (Trooper Gould) to stand guard over Mr. Miranda. For the next several minutes, Trooper Austin's interaction with Mr. Look is captured, as follows:

| | |
|---|---|
| 2:37 | Trooper Austin stands up and asks Mr. Look to "step out of the car for me" |
| 2:39 | Mr. Look says, "yup" |
| 2:41 | Tr Austin signals another officer to approach the passenger side |
| 2:58 | Mr. Look is out of car and Tr. Austin says, "come on back here Cody"; another officer is speaking with Mr. Miranda |
| 3:08 | Tr. Austin, out of camera range, asks "do you have anything on you;" |
| 3:12 | Tr. Austin (off camera) asks Mr. Look to "come over here" and "put your hands up here," adding "I just want to pat you down for weapons." |
| 3:23 | This patdown apparently complete Trooper Austin asks, "Where did you pick him up"; Mr. Look responds "outside of Bangor there." Tr. Austin, "where abouts?" |
| 3:29 | Mr. Look says, "I think it was Plymouth." |
| 3:33 | Tr. Austin, "where is he from originally? |
| 3:35 | Mr. Look, "I don't know he's just my friend's cousin" |
| 3:39 | Mr. Austin, "who's your friend" |
| 3:42 | Mr. Look, "Yes. Tim's my cousin. It's his friend. So I come to got him." |

| | |
|---|---|
| 3:47 | Tr. Austin, "What's his name?" |
| 3:49 | Mr. Look, "I don't know his name; I just met him." |
| 3:53 | Tr. Austin, "so where are you taking him." |
| 3:54 | Mr. Look, "down to my cousin's" |
| | Tr. Austin, "who's that? Mr. Look (repeating himself), "Tim." |
| 4:00 | Tr. Austin, "okay; so where about in Plymouth did you pick him up? |
| 4:02 | Mr. Look, "just right off the exit there." |
| 4:08 | Tr. Austin (falsely) "You can't have weed in the car like that, dude." |
| 4:11 | Mr. Look (correctly) "I thought it was legal to have, but you couldn't smoke it; I told him not to smoke it" |
| 4:17 | Tr. Austin directs Mr. Look to "stand right in front of my car" and approaches the other officer speaking with Mr. Miranda through the passenger side window |
| 4:27 | Other officer joins Mr. Look at front of Austin cruiser; Tr. Austin questions Mr. Miranda through passenger window |
| 5:06 | Tr. Austin returns toward his cruiser carrying documents, asks another officer to stand by the passenger window, asking Mr. Look to "put your hands right on the car." |
| 5:21 | Tr. Austin calls dispatch and asks "can we get 924 started please." Other voice says it will start at 924 |
| 5:48 | Tr. Austin says he has a "27 and a 29 out of New York." He provides Mr. Miranda's name, address and date of birth. |
| 6:33 | Dispatch seems to call Tr. Austin and report that it has "I.D. only for New York." |
| 6:38 | Tr. Austin responds, "10-4" and then provides the name, address and date of birth for the driver, Mr. Look. |
| 7:00 | Dispatch responds in codes |
| 7:10 | Tr. Austin responds, "10-4; *we're going to be detaining two individuals*." |

| | |
|---|---|
| 7:52 | Tr. Austin says, "Cody will you come back here" and Mr. Look moves left and off camera |
| 7:58 | Tr. Austin says, "so; where did you pick him up?" |
| 8:01 | Mr. Look responds, "right around Plymouth" |
| 8:11 | Tr. Austin asks if there is "anything in the car you shouldn't have? Mr. Look responds, "nope; nope, not that I know of" |
| 8:19 | Tr. Austin says, "at this point I got a drug canine coming" and asks "is it going to find anything in the car? Honesty is the best policy." |
| 8:30 | Mr. Look responds, "no" not that I know of (or words to that effect) |
| 8:56 | Tr. Austin, "nothing on him?" and Mr. Look responds, "no, not that I know of." |
| 9:04 | Mr. Look repeats his understanding that "I thought it was legal to have. He was just rolling it [inaudible] |
| 9:23 | Tr. Austin, "okay; turn around for me; I'm going to put handcuffs on." |

The conversation obviously has nothing to do with investigating a loud exhaust. Notably, Trooper Austin did not call in either occupants' identification until five minutes, forty-eight seconds into the video; and he started with Mr. Miranda's information, not Mr. Look's.

The video refutes Trooper Austin's testimony that Mr. Look "changed his story" about whether Mr. Miranda was his "friend's cousin" or his "cousin's friend." Instead, Mr. Look's words (and his tone on the audio) make clear he simply misspoke and immediately corrected himself, as follows:

| | |
|---|---|
| 3:35 | Mr. Look, "I don't know he's just my friend's cousin" |
| 3:39 | Mr. Austin, "who's your friend" |
| 3:42 | Mr. Look, "Yes. Tim's my cousin. It's his friend. So I come to got him." |

Similarly, Trooper Austin's testimony that Mr. Miranda and Mr. Look provided inconsistent information about where Mr. Look they were coming from. The two men answered

differently, but as Trooper Austin admitted on cross-examination their answers were consistent and he had and has no basis to dispute that they were both accurate.  Mr. Look mentioned a municipality – near Plymouth.  Mr. Miranda mentioned the chain restaurant in that location where he actually bought food, and displayed the packaging.

Trooper Austin's suggestion that he found Mr. Look's reference to "near Plymouth" to be suspicious because he was told there is a gang hangout near the interstate around Plymouth is neither credible nor material.  Many Maine towns house criminals.  But, like all those towns, the Plymouth area has many more entirely innocent homes and businesses.  Significantly, Trooper Austin apparently asked no follow-up questions about the supposed gang hangout, and none of the questions he did ask elicited any nervous or suspicious response.

It is unclear from the video recordings whether, immediately before handcuffing Mr. Look at (9:23 of the video), Trooper Austin patted him down a second time as Mr. Look's Memorandum recounts.  It is clear, however, that the pat-down or pat-downs of Mr. Look were performed by a single officer and lasted no more than ten seconds.

On the other hand, as Trooper Austin handcuffed, Mr. Look the other two officers present began extraordinary, minutes-long, multi-officer process of thoroughly searching Mr. Miranda. Before the officers claimed to have felt anything suspicious, the search lasted minutes, included lifting Mr. Miranda's shirt and officers probing his body.  Although the officers testified they were engaged in only a "safety" "frisk" for weapons, the video makes clear they were instead searching for evidence – and ultimately asserted that they felt evidence "in [Mr. Miranda's] ass." The video depiction of the search is fairly summarized on the attached timeline, as follows:

9:54                    As the other two officers open the passenger door and apparently instruct
                       Mr. Miranda to get out of the Look vehicle, Tr. Austin (still off camera)

|  | says to Mr. Look, "I'm going to put you in my car; it's a little warmer in here." |
|---|---|
| 10:02 | Mr. Miranda gets out of car as directed and proceeds with his hands raised to the rear of the Look vehicle |
| 10:00 | One of the officers shines a flashlight on Mr. Miranda's backside, apparently noting no visible bulge |
| 10:08 | Mr. Miranda is asked if he has *anything* on him, and the search of Mr. Miranda begins. |
| 10:09-10:14 | One of the officer reaches under Mr. Miranda's outer sweatshirt (and perhaps under his shirt as well) in patting down is mid-section. |

[NOTE: **EXHIBIT B** is a screenshot of an officer lifting Mr. Miranda's clothing at 10:09.]

| 10:19 | Trooper Austin approaches Mr. Miranda and joins the so-called patdown; someone, likely Trooper Austin asks, "you got anything on you, bud?" Mr. Miranda says, "no"; officer responds "okay nothing in the car," all as the so-called pat down continues; |
|---|---|
| 10:25 | Mr. Miranda is directed to twirl around, and he does |
| 10:35 | three officers are engaged in intrusive search of Mr. Miranda, with their bodies pressed against Mr. Miranda |

[Note: **EXHIBIT C** is a screenshot of three officers searching Mr. Miranda 10:36 into the video)

| 10:41 | Although his hand is below camera range Trooper Austin appears to be pressing in the area of Mr. Miranda's buttocks |
|---|---|
| 10:45 | Trooper Austin reaches for his belt and the officers rotate around Mr. Miranda |
| 10:50 | One of the officers (likely Trooper Austin) says, "there's *something* right there dude," |
| 10:55 | handcuffs are on Mr. Miranda |
| 11:10 | Mr. Miranda is pressed against car told, "right over here; bend over." |
| 11:16 | conversation that cannot be heard on this video continues; officers are surrounding Mr. Miranda, blocking the camera's view of him; the search continues |

| | |
|---|---|
| 11:35 | The officer most completely blocking the camera's view of Mr. Miranda departs off camera toward the cruisers |
| 11:40 | Trooper Austin says, "***you've got dope in your ass***." Mr. Miranda responds, "that's illegal, sir." |
| 11:50 | the officers remove Mr. Miranda's wallet and other items and one says, "I'm putting them on the trunk here." |
| 11:52 | Mr. Miranda again says, "that's illegal, sir." Trooper Austin responds, "it's not illegal; I felt it." |
| 12:05 | Trooper Austin appears to be talking on radio as third officer returns |
| 12:37 | radio communication regarding personal protection equipment and then an officer (likely Trooper Austin heads off camera) |
| 13:40 | conversation at first inaudible; someone says, "personal protective equipment" as an officer (likely Tr. Austin) begins to put on apparatus that looks like a gas mask |
| 15:09 | officers move Mr. Miranda to right side of trunk of Look vehicle, bend him over vehicle; two officers are blocking view of camera; third officer apparently removes that object that had been detected "*in [Mr. Miranda's] ass*" – and holds it up to camera |

Note: EXHIBIT D is a screenshot of Trooper Austin holding the package up in front of the camera and EXHIBIT E is a photo of the package provided as supplemental discovery after the motion hearing.

Neither Trooper Austin nor Trooper Gould could recall a prior instance in which they had participated in a multi-officer of a safety frisk for weapons during a *Terry* stop. Yet they claimed they were engaged in a mere "safety" frisk for weapons of Mr. Miranda. Defendant Miranda respectfully submits, as he politely did at the scene that the video evidence instead proves the following:

1. The search of Mr. Miranda was not a safety frisk permitted by Terry, but a highly-intrusive search for evidence; the search was entirely unlike the pat-down of Mr. Look or of any proper weapons pat-down;

2. The search included lifting Mr. Miranda's outer clothing and search under that clothing;

3. Although Trooper Austin claimed he felt something hard on the side of Mr. Miranda's butt cheek, his on the scene more candid statement was that he felt what he concluded was drugs "in [Mr. Miranda's] ass," and that is the area in which he was probing;

4. Although Trooper Austin testified that he wore protective equipment because he might encounter fentanyl, he instead wore that equipment because, as he seemed to express on the video, that he was removing items from within Mr. Miranda's anal cavity; indeed, the officers did not wear protection breathing equipment when searching the car of bags for drugs, only when apparently searching within Mr. Miranda's anus after feeling his ass from outside his pants;

5. The package Trooper Austin removed from Mr. Miranda's buttocks or anus could not logically have been on the outside of his butt cheek without causing a visible lump; and

6. Trooper Austin was not looking for weapons, but was not able to identify that nature of the item he felt "in Mr. Miranda's ass" based on any "plain feel" doctrine.

Trooper Austin's difficulty identifying the item and his sense that he felt something that was inside Mr. Miranda's anal passage (an area not properly felt in any "frisk" for weapons) is corroborated by the audio from Trooper Gould's cruiser, including the following exchanges (the times are from the Trooper Gould cruiser video, which started fifty seconds later than Trooper Austin's video):

9:01                    Officer says, "hey bud, how's it going; can I get your first name?"

9:04            Apparently Mr. Miranda, "Jose"

9:05            "Step out of the car for me, Jose"

9:19            Officer says something inaudible apparently related to search and asks, 'do you have anything on you"

9:30            Second officer, "Do you have anything on you [inaudible] car [inaudible] on you . . ."

9:38            "spread your legs for me."

9:45            inaudible conversation between officer and Mr. Miranda

9:50            inaudible conversation apparently about what something is

10:01           Officer "you've got something right there, dude"

10:09           Officer, "I just don't want to get [inaudible], all right"

10:14           Officer, ***"what is that, dude?"***

10:16           Officer, ***"what is that?"***

10:18           "umm"

10:19           "All right; right over here"

10:21           "Bend over"

10:25           ***"What is that, dude?"***

10:28           "That's illegal" [inaudible]

10:33           Miranda "…***in my ass"***

10:40           Miranda "[Inaudible] that's illegal]

10:42           ***"That's a rubber glove"***

10:50           Officer jogs into, then out of view of this cruiser's camera (audio limited to officer jogging – this time corresponds to the time of the Austin cruiser video when Trooper Austin says, "you've got drugs in your ass")

11:14           officer jogs back into and then again out of view of cruiser's camera [audio still limited apparently due to officer running]

| | |
|---|---|
| 11:26 | inaudible conversation |
| 11:34 | inaudible conversation |
| 11:39 | "I told you, you were being detained.  I could feel it on you.  I'm going to work with you, alright.  I'm not trying to make your life worse, alright?" [inaudible]. |
| 11:53 | "I understand [inaudible] |
| 11:58 | Radio instruction to "make sure that personal protective equipment is being used." |
| 12:53 | Officer, "I'm not trying to make it worse for you, alright? You've been up front with me.  Alright?" |
| 12:58 | "What's that?" |
| 12:59 | "Personal protection [inaudible]" |
| 13:05 | ***"whatever is in there, okay"*** |
| 13:17 | "one step at a time" |
| 13:18 | Mr. Miranda, "please, please, please." |
| 13:21 | ***"How much you got in there, dude?"*** |
| 13:24 | inaudible |
| 13:26 | Mr. Miranda, "please" [inaudible] |
| 13:30 | conversation about coat and cold |
| 14:00 | Miranda "can I get my coat?" |
| 14:16 | "bend over" |
| 14:18 | [inaudible] "hands right up for us" |
| 14:25 | [inaudible] "***you got any more up there***" |
| 14:27 | Mr. Miranda, "no you [inaudible] my ass though" |
| 14:29 | "stay right there" |
| 14:32 | ***"you hurt my ass, though"*** |

II.     **The warrantless search of Mr. Miranda's bag locked in the trunk was improper**

The Austin video (Gov. Ex. 10 documents) that at least one of the bags in the trunk of Mr. Look's car was searched on several occasions, including most thoroughly twenty-five minutes and thirty seconds into the video.  At that time at least one of the two bags in the trunk was searched, likely Mr. Miranda's bag, since Mr. Look described the bag that belonged to Mr. Miranda.  Long before that search, both Mr. Look and Mr. Miranda had been handcuffed and placed in separate patrol cars.  They had no access to anything in the trunk at that time.  Indeed, they had no access to anything in the trunk at any time after the stop was initiated.

According to Trooper Austin's testimony, the second bag was searched the following day, after the Look vehicle had been impounded, but still without any warrant.

There is no evidence on the video or otherwise, that Mr. Miranda after consented to or authorized the search of his bag.  His declaration confirms that he authorized no such search. The warrantless search of his bag was plainly unconstitutional and all evidence found during that search must be suppressed.

CONCLUSION

For the reasons set forth in his motion to suppress, his reply memorandum and in this post-hearing memorandum, all evidence discovered during the search of Mr. Miranda, all statements he made at least from the time he was placed in handcuffs, and all evidence found in his bag in the trunk of Mr. Look's vehicle must be suppressed.

EXECUTED at Portland, Maine, this 24th day of January, 2020.

/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658
Attorney for defendant Jose Miranda

Thompson, MacColl & Bass, LLC, P.A.
P.O. Box 447
Portland, ME  04112-0447
(207)  774-7600
emaccoll@thomport.com

### CERTIFICATE OF SERVICE

I, Edward S. MacColl, do hereby certify that I made due service of the above document by electronically filing the same using the Court's EM/ECF system.

/s/ Edward S. MacColl
Edward S. MacColl, BRN #2658

DETAIL OF AUDIO FROM TROOPER AUSTIN CRUISER (recording labeled 00001729.mp4) (Gov. Exhibit 1)

| Time | Description |
|------|-------------|
| 1:00 | Blue Lights |
| 1:04 | passes intervening car |
| 1:08 | Look vehicle signals and pulls over |
| 1:10 | audio begins |
| 1:29 | Trooper Austin comes into view approaching Look and leans into talk |
| 2:37 | Trooper Austin stands up and asks Mr. Look to "step out of the car for me" |
| 2:39 | Mr. Look says, "yup" |
| 2:41 | Tr Austin signals another officer to approach the passenger side |
| 2:58 | Mr. Look is out of car and Tr. Austin says, "come on back here Cody"; another officer is speaking with Mr. Miranda |
| 3:08 | Tr. Austin, out of camera range, asks "do you have anything on you;" |
| 3:12 | Tr. Austin (off camera) asks Mr. Look to "come over here" and "put your hands up here," adding "I just want to pat you down for weapons." |
| 3:23 | This patdown apparently complete Trooper Austin asks, "Where did you pick him up"; Mr. Look responds "outside of Bangor there."  Tr. Austin, "where abouts?" |
| 3:29 | Mr. Look says, "I think it was Plymouth." |
| 3:33 | Tr. Austin, "where is he from originally? |
| 3:35 | Mr. Look, "I don't know he's just my friend's cousin" |
| 3:39 | Mr. Austin, "who's your friend" |
| 3:42 | Mr. Look, "Yes. Tim's my cousin.  It's his friend.  So I come to got him." |
| 3:47 | Tr. Austin, "What's his name? |
| 3:49 | Mr. Look, "I don't know his name; I just met him." |
| 3:53 | Tr. Austin, "so where are you taking him." |
| 3:54 | Mr. Look, "down to my cousin's" |

|        | Tr. Austin, "who's that?<br>Mr. Look (repeating himself), "Tim." |
|--------|---|
| 4:00   | Tr. Austin, "okay; so where about in Plymouth did you pick him up?" |
| 4:02   | Mr. Look, "just right off the exit there." |
| 4:08   | Tr. Austin (falsely) "You can't have weed in the car like that, dude." |
| 4:11   | Mr. Look (correctly) "I thought it was legal to have, but you couldn't smoke it; I told him not to smoke it" |
| 4:17   | Tr. Austin directs Mr. Look to "stand right in front of my car" and approaches the other officer speaking with Mr. Miranda through the passenger side window |
| 4:27   | Other officer joins Mr. Look at front of Austin cruiser; Tr. Austin questions Mr. Miranda through passenger window |
| 5:06   | Tr. Austin returns toward his cruiser carrying documents, asks another officer to stand by the passenger window, asking Mr. Look to "put your hands right on the car." |
| 5:21   | Tr. Austin calls dispatch and asks "can we get 924 started please." Other voice says it will start at 924 |
| 5:48   | Tr. Austin says he has a "27 and a 29 out of New York." He provides Mr. Miranda's name, address and date of birth. |
| 6:33   | Dispatch seems to call Tr. Austin and report that it has "I.D. only for New York." |
| 6:38   | Tr. Austin responds, "10-4" and then provides the name, address and date of birth for the driver, Mr. Look. |
| 7:00   | Dispatch responds in codes |
| 7:10   | Tr. Austin responds, "10-4; *we're going to be detaining two individuals*." |
| 7:52   | Tr. Austin says, "Cody will you come back here" and Mr. Look moves left and off camera |
| 7:58   | Tr. Austin says, "so; where did you pick him up?" |
| 8:01   | Mr. Look responds, "right around Plymouth" |
| 8:11   | Tr. Austin asks if there is "anything in the car you shouldn't have? Mr. Look responds, "nope; nope, not that I know of" |
| 8:19   | Tr. Austin says, "at this point I got a drug canine coming" and asks "is it going to find anything in the car? Honesty is the best policy." |

| | |
|---|---|
| 8:30 | Mr. Look responds, "no" not that I know of (or words to that effect) |
| 8:56 | Tr. Austin, "nothing on him?" and Mr. Look responds, "no, not that I know of." |
| 9:04 | Mr. Look repeats his understanding that "I thought it was legal to have. He was just rolling it [inaudible] |
| 9:23 | Tr. Austin, "okay; turn around for me; I'm going to put handcuffs on." |
| 9:43 | A third officer comes into view of cruiser camera (while Tr. Austin is still off camera) |
| 9:54 | As the other two officers open the passenger door and apparently instruct Mr. Miranda to get out of the Look vehicle, Tr. Austin (still off camera) says to Mr. Look, "I'm going to put you in my car; it's a little warmer in here." |
| 10:02 | Mr. Miranda gets out of car as directed and proceeds with his hands raised to the rear of the Look vehicle |
| 10:00 | One of the officers shines a flashlight on Mr. Miranda's backside, apparently noting no visible bulge |
| 10:08 | Mr. Miranda is asked if he has *anything* on him, and the so-called patdown of Mr. Miranda begins. |
| 10:14 | One of the officer reaches under Mr. Miranda's outer sweatshirt (and perhaps under his shirt as well) in patting down is mid-section. |
| 10:19 | Trooper Austin approaches Mr. Miranda and joins the so-called patdown; someone, likely Trooper Austin asks, "you got anything on you, bud?" Mr. Miranda says, "no"; officer responds "okay nothing in the car," all as the so-called pat down continues; |
| 10:25 | Mr. Miranda is directed to twirl around, and he does |
| 10:35 | three officers are engaged in intrusive search of Mr. Miranda, with their bodies pressed against his |
| 10:41 | Although his hand is below camera range Trooper Austin appears to be pressing in the area of Mr. Miranda's buttocks |
| 10:45 | Trooper Austin reaches for his belt and the officers rotate around Mr. Miranda |
| 10:50 | One of the officers (likely Trooper Austin) says, "there's *something* right there dude," |
| 10:55 | handcuffs are on Mr. Miranda |

3

| | |
|---|---|
| 11:10 | Mr. Miranda is pressed against car told, "right over here; bend over." |
| 11:16 | conversation that cannot be heard on this video continues; officers are surrounding Mr. Miranda, blocking the camera's view of him; the search continues |
| 11:35 | The officer most completely blocking the camera's view of Mr. Miranda departs off camera toward the cruisers |
| 11:40 | Trooper Austin says, "***you've got dope in your ass***." Mr. Miranda responds, "that's illegal, sir." |
| 11:50 | the officers remove Mr. Miranda's wallet and other items and one says, "I'm putting them on the trunk here." |
| 11:52 | Mr. Miranda again says, "that's illegal, sir."  Trooper Austin responds, "it's not illegal; I felt it." |
| 12:05 | Trooper Austin appears to be talking on radio as third officer returns |
| 12:37 | radio communication regarding personal protection equipment and then an officer (likely Trooper Austin heads off camera) |
| 13:40 | conversation at first inaudible; someone says, "personal protective equipment" as an officer (likely Tr. Austin) begins to put on apparatus that looks like gas mask |
| 15:09 | officers move Mr. Miranda to right side of trunk of Look vehicle, bend him over vehicle; two officers are blocking view of camera; third officer apparently removes that object that had been detected "*in [Mr. Miranda's] ass*" – and holds it up to camera |
| 15:23 | Closest on camera view of the object removed from "in [Mr. Miranda's] ass".  The item appears to have substantial packaging and tape that had held it in place |
| 15:56 | Officer returns; still wearing gas mask type equipment; two officers are interrogating Mr. Miranda, but conversation is inaudible on this cruiser camera |
| 16:19 | Officer wearing mask moves off camera |
| 16:49 | Conversation with Mr. Miranda in which to the question, "who to you want to call, brother," he responds he "wants to call my wife" |
| 16:57 | An officer puts Mr. Miranda's coat over him |
| 17:05 | An officer is searching the car |
| 17:56 | Mr. Miranda is escorted off camera and to the right of the Austin cruiser |

4

| | |
|---|---|
| 18:09 | As two officers speak jokingly in front of Austin cruiser, one (likely Trooper Austin) says, "i felt it" the sound is then lost |
| 18:50 | Two officers are searching interior of Look vehicle |
| 19:52 | The officer to the right removes an item from the car, looks at it closely, and placed it on the hood |
| 20:43 | One of the officers searching the vehicle opens trunk and begins searching in it briefly |
| 21:39 | Officers leave area of Look vehicle |
| 25:03 | officer out of camera view can be heard saying "there are two backpacks in the back," apparently in a radio conversation |
| 25:25 | Officer reaches into car and opens trunk |
| 25:30 | Search of trunk resumes, apparently including search of bag or bags |
| 25:44 | Second officer joins search of trunk |
| 26:42 | Third officer (with sergeant's stripes) enters camera view |
| 27:17 | Officer (probably Tr. Austin) warns sergeant, for by mouthing the warns and then by saying, he has an "open mike" |
| 27:36 | Officer (apparently Tr. Austin) provides the sergeant with a "rundown," much of which cannot be heard on this cruiser cam recording |
| 27:53 | Two more officers enter camera view |
| 28:10 | Trooper Austin describes search of Mr. Miranda (again most of discussion cannot be heard on this recording) |
| 29:08 | Trooper Austin explains he "just went through the first one" and mentions the "second one," apparently referring to two bags in the trunk |
| 29:38 | After consultation with other officers, Trooper Austin closes trunk |
| 30:10 | Trooper Austin says of when asked if he "talked with" the "passenger," "yes; I haven't read him his Miranda yet" |
| 1:12:23 | Canine search apparently begins |
| 1:13:15 | Canine enters car |
| 1:21:30 | Trooper Austin vehicle departs |

5

DETAIL OF AUDIO FROM OTHER CRUISER CAMERA, This recording started approximately fifty seconds after Trooper Austin's recording started. (video labeled 00001731.mp4) (Gov. Exhibit 1)

Time

| | |
|---|---|
| 9:01 | Officer says, "hey bud, how's it going; can I get your first name?" |
| 9:04 | Apparently Mr. Miranda, "Jose" |
| 9:05 | "Step out of the car for me, Jose" |
| 9:19 | Officer says something inaudible apparently related to search and asks, 'do you have anything on you" |
| 9:30 | Second officer, "Do you have anything on you [inaudible] car [inaudible] on you . . ." |
| 9:38 | "spread your legs for me." |
| 9:45 | inaudible conversation between officer and Mr. Miranda |
| 9:50 | inaudible conversation apparently about what something is |
| 10:01 | Officer "you've got something right there, dude" |
| 10:09 | Officer, "I just don't want to get [inaudible], all right" |
| 10:14 | Officer, "what is that, dude?" |
| 10:16 | Officer, "what is that?" |
| 10:18 | "umm" |
| 10:19 | "All right; right over here" |
| 10:21 | "Bend over" |
| 10:25 | "What is that, dude?" |
| 10:28 | "That's illegal" [inaudible] |
| 10:33 | Miranda "…in my ass" |
| 10:40 | Miranda "[Inaudible] that's illegal" |
| 10:42 | "That's a rubber glove" |
| 10:50 | Officer jogs into, then out of view of this cruiser's camera (audio limited to officer jogging – this time corresponds to the time of the Austin cruiser video when Trooper Austin says, "you've got drugs in your ass") |

| | |
|---|---|
| 11:14 | officer jogs back into and then again out of view of cruiser's camera [audio still limited apparently due to officer running] |
| 11:26 | inaudible conversation |
| 11:34 | inaudible conversation |
| 11:39 | "I told you you were being detained.  I could feel it on you.  I'm going to work with you, alright.  I'm not trying to make your life worse, alright?" [inaudible]. |
| 11:53 | "I understand [inaudible] |
| 11:58 | Radio instruction to "make sure that personal protective equipment is being used." |
| 12:53 | Officer, "I'm not trying to make it worse for you, alright? You've been up front with me.  Alright?" |
| 12:58 | "What's that?" |
| 12:59 | "Personal protection [inaudible]" |
| 13:05 | "whatever is in there, okay" |
| 13:17 | "one step at a time" |
| 13:18 | Mr. Miranda, "please, please, please." |
| 13:21 | "How much you got in there, dude?" |
| 13:24 | inaudible |
| 13:26 | Mr. Miranda, "please" [inaudible] |
| 13:30 | conversation about coat and cold |
| 14:00 | Miranda "can I get my coat?" |
| 14:16 | "bend over" |
| 14:18 | [inaudible] "hands right up for us" |
| 14:25 | [inaudible] *__you got any more up there__* |
| 14:27 | Mr. Miranda, "no you [inaudible] my ass though" |
| 14:29 | "stay right there" |
| 14:32 | "you hurt my ass, though" |
| 14:44 | Mr. Miranda asks to call wife; permission denied |
| 14:57 | "is there anything in that coat that's gonna [inaudible]?" |

15:02          Mr. Miranda asks to call wife; permission denied

15:10          [inaudible}

15:12          Mr. Miranda, "no, I ain't got nothing, sir."

15:16          Officer, "is there anything else they're gonna find."

15:19          Additional interrogation about what else will be found

22:00          Conversation between officer and Mr. Miranda in this cruiser, including
               questions posed by officer, such as "what's this right here; is this a cell
               phone"? "Is that your cell phone?" response, "my cell phone."



10:09     











15:23





**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **.** |
| | **.** |
| **v.** | **.** |
| | **.**   **1:19-cr-00118-LEW** |
| **JOSE MIRANDA,** | **.** |
| | **.** |
| **Defendant.** | **.** |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**DECLARATION OF JOSE MIRANDA**

Jose Miranda, under the pains and penalties of perjury, states as follows:

1.      I make this declaration to establish my expectation of privacy with respect to a bag I placed in the trunk of the car driven by Mr. Cody Look on March 11, 2019.

2.      I placed a bag with personal possessions in the trunk of his car when he picked me up adjacent to an exit off of Interstate 95 in or around Plymouth, Maine, earlier that day.

3.      I did not authorize Mr. Look or any law enforcement officer to search, look in or do anything with my bag.

4.      At all times I had what I believed, and what I still believe, was a reasonable expectation of privacy in that bag and in my personal possessions inside it.

Executed at New York, New York, this ___ day of January, 2020, under the pains and penalties of perjury.

/s/ Jose Miranda_____
Jose Miranda

### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 1:19-cr-118-LEW |
| | ) | |
| JOSE MIRANDA | ) | |
| CODY LOOK | ) | |

### GOVERNMENT'S POST-HEARING MEMORANDUM

The United States of America, by and through its undersigned counsel, hereby files its post-hearing Memorandum.  For the reasons set forth below and in the Government's initial filing, the motion to suppress should be denied as to both Defendants.

The Government incorporates the legal analysis previously submitted to the Court (ECF No. 61) and offers the following additional argument in response to the post-hearing defense submissions:

   A. *Defendant Look's Challenge to the Length of the Traffic Stop*

This issue is discussed at pages 3-5 of the Government's initial submission.  The stop and the duration of the seizure were fully authorized in this case.  Even if it was a pretext stop, it was entirely lawful.  *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011) ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else.").

   B. *Defendant Look's* Miranda *Challenges*

Defendant Look asserts that his statements were made in violation of *Miranda*.  Nothing about the roadside interaction prior to the discovery of narcotics warranted *Miranda* warnings.  At their inception, *Terry* stops generally do not require *Miranda* warnings.  *See United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005).  Prior to the discovery of the drugs, Look was on a

1

public roadway and not in custody.  Roadside questioning is simply not custodial interrogation. *United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014).  *Miranda* warnings were not required.

C. *Defendant Look's Challenge to the* Miranda *Warning*

Look asserts that *Miranda* warnings provided to him after the drug seizure from Miranda were improper.  This argument fails.  "When an individual is taken into custody and before interrogation, *Miranda* requires that the individual be advised: that he has the right to remain silent; that anything he says may be used against him in court; that he has the right to consult an attorney before being asked questions; that the attorney may be present during questioning; and that if he cannot afford an attorney, one will be appointed for him if he wishes."  *United States v. Garcia*, 983 F.2d 1160, 1169 (1st Cir. 1993).

Look received *Miranda* warnings from 22:25 – 23:04 of the Austin video.  The video confirms that Look was advised of all aspects of his rights.  He acknowledges each right by answering, "Yes" or "Yup."  The defense makes no attempt to argue that he was under duress or otherwise involuntarily waived his rights.  There is no evidence to support any claim that his waiver was involuntary.  Quite simply, the *Miranda* warning was without error.[1]

D. *Defendant Miranda's Description of the Pat-Down*

Miranda describes the pat-down as an "extraordinary, minutes-long, multi-officer process of thoroughly searching Mr. Miranda.  Before the officers claimed to have felt anything suspicious, the search lasted minutes …."  This description is entirely inconsistent with the video.[2]

---

[1] Look does not challenge the pat-down of Miranda as he has no standing to do so.  He also does not challenge the search of his vehicle.

[2] Miranda offers no authority suggesting that two officers engaging in a pat-down is unreasonable.

2

Miranda steps out of the vehicle at 9:59 of the Austin video.  After lifting his arms in response to a pat-down request, Miranda is first physically contacted by one of the officers at the 10:11 mark of the video.  It appears that only one officer is frisking Miranda at this point.  At the 10:26 mark, Miranda is asked to turn around.  He complies.  Two officers then participate in the pat down.  Trooper Austin immediately feels contraband.  He reaches for his handcuffs at the 10:45 mark.  Thus, from the time Miranda got out of the car to the plain-feel of the contraband, no more than 46 seconds elapsed.

Contrary to Miranda's description, the evidence did not show Trooper Austin reaching inside Miranda's anal passage.  Trooper Austin's testimony was clear that the package was protruding to the outside of Miranda's butt cheeks and was immediately recognizable as narcotics.  The video corroborates this testimony.  Once Trooper Austin felt the immediately apparent incriminating nature of the object, he had probable cause to believe that drugs were concealed on Miranda's person and was "authorized to undertake a more intrusive search." *United States v. Carter*, No. 2:17-cr-284, 2019 U.S. Dist. LEXIS 205376, at *533 (W.D. Pa., Nov. 26, 2019).  Nothing about the ensuing removal of the contraband was unlawful.[4]

E.  *The Subsequent Search of the Vehicle*

The vehicle search is addressed at pages 7-8 of the Government's initial memorandum and is incorporated herein.  Probable cause existed to search the vehicle.

---

[3] Miranda also asserts that the use of personal protection equipment was because Trooper Austin was "removing items from within Mr. Miranda's anal cavity."  This assertion is undercut by the video.  At the 12:44 mark of the Austin video, it is apparent that the officers on scene are instructed to use this equipment by the dispatcher.  Trooper Austin complied with this directive and testified it was a precaution against fentanyl exposure.

[4] The size of the package depicted in Exhibits D and E to Miranda's Post-Hearing Submission undercuts his assertion that the package was in his anal passage and supports Trooper Austin's testimony.

3

## **CONCLUSION**

Wherefore, the Government requests that this Court to issue an order denying the

Defendants' Motion to Suppress.

Dated this 7th day of February, 2020.

Respectfully submitted,

Halsey B. Frank
United States Attorney

/s/David B. Joyce
Assistant U.S. Attorney
United States Attorney's Office
100 Middle Street
Portland, ME 04101
david.joyce@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on February 7, 2020, I filed the foregoing Memorandum using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.


                          /s/David B. Joyce
                          Assistant U.S. Attorney
                          United States Attorney's Office
                          100 Middle Street
                          Portland, ME 04101
                          david.joyce@usdoj.gov