UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:19-CR-00118-LEW |
| | ) | |
| CODY LOOK and JOSE MIRANDA, | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON DEFENDANT JOSE MIRANDA'S MOTION TO SUPPRESS AND MOTION TO COMPEL AND ORDER ON DEFENDANT CODY LOOK'S MOTION TO SUPPRESS**

On November 7, 2019, a Grand Jury charged Defendants Jose Miranda and Cody Look in a superseding indictment alleging possession with intent to distribute a mixture or substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting the same, 18 U.S.C. § 2. Mr. Miranda now moves to suppress evidence gathered during the March 11, 2019 seizure of a vehicle in which he was a passenger, subsequent searches, and post-arrest interrogation. Defendant Miranda's Motion to Suppress (ECF No. 52). Mr. Look orally joined in the request for a hearing, without objection, and moves to suppress statements offered in response to interrogation. Defendant Miranda also filed a Motion to Compel Discovery (ECF No. 51).

## BACKGROUND

On February 4, 2019, while traveling through Jonesport, Maine State Trooper Jeffrey Thayer pulled over a black sedan that was emitting excessive decibels from its muffler. During the stop, Trooper Thayer identified not only the driver, Cody Look of Cutler, but also his passenger, Troy Brooks of the Bronx, New York.

On the afternoon of March 11, 2019, Look climbed into the black sedan and set out for Plymouth, Maine, to retrieve Jose Miranda, also of the Bronx, and transport him downeast. The sedan's exhaust was still emitting excessive decibels.

Around 4:30 p.m., Maine State Trooper Dana Austin was in his cruiser near the intersection of Route 1 and the Washington Junction Road in Hancock when he took note of the sedan and its decibels and ran a registration query. Austin learned that Trooper Taylor recently stopped the vehicle for excessive exhaust noise. He also learned that Look had been the driver and that Look was transporting a passenger who hailed from the Bronx. Austin contacted Taylor for intel, and Taylor informed Austin that area law enforcement considered Look a drug runner. Austin was able to download a picture of Look and recognized him as the man driving the sedan.

Given the vehicle's trajectory,[1] Trooper Austin concluded that Look was leaving Downeast Maine,[2] but would return later in the day. Knowing he had a reasonable articulable basis to stop the vehicle (the exhaust), and suspecting Look's westward travel was drug related, Austin decided to await Look's return and asked area law enforcement to help him keep an eye out. About 5:00 p.m., Austin received word that Look's sedan was spotted rumbling westward down 1A in Holden. Shortly after sunset, Austin received

---

[1] From the east, the Washington Junction Road offers an alternative route into Ellsworth that avoids the more heavily trafficked, commercial corridor of Route 1.

[2] The term "Downeast" likely was coined by mariners in the Nineteenth Century and perhaps referenced a larger stretch of the Maine coast, but today the term generally is understood to reference Maine east of Penobscot Bay, encompassing all of Hancock and Washington Counties. Although Ellsworth does not lie at the western extreme of Downeast Maine, the citizens of Ellsworth consider their city the gateway to Downeast Maine. This makes sense from the perspective of someone arriving in Ellsworth via Route 1A, but those who travel east via Route 1 might give the title to Bucksport.

word of another sighting. This time, the vehicle was east-bound in Holden. Austin parked his cruiser at the juncture of 1A and the Upper Dedham Road. He heard the vehicle before he saw it, pulled into traffic behind it, and lit it up. Look pulled the sedan to the shoulder. Austin's dashcam time stamped the traffic stop at 01:00.

As Austin walked up to the vehicle, two other Maine State Troopers were *en route* to his location. Austin obtained Look's license, registration, and proof of insurance. As he did so, he observed a black male passenger reclined in the passenger seat. Austin did not detect the smell of burnt marijuana, but he saw that the passenger had loose marijuana and a blunt in his lap.

About this time (dashcam 02:35)[3], Trooper Adam Gould arrived on the scene. When he did, Austin asked Look to exit the vehicle, which Look did. Austin walked Look toward his cruiser and started to ask Look some questions. Gould approached the passenger side and spoke with Miranda. He did not have Miranda exit, but stood by the side of the vehicle to keep an eye on Miranda while Austin questioned Look.

Back at the cruiser, Austin asked Look who his passenger was. Look stated, "That's my friend's cousin." Austin patted Look down for weapons and did not detect anything. Austin asked where they were coming from. Look stated he had just picked up his passenger outside Bangor, and on further inquiry, in Plymouth. Asked where the passenger was from originally, Look said he did not know and stated, "He's just my friend's cousin, I guess." Asked who his friend was, Look stated, "Tim's my cousin, and it's his friend."

---

[3] The dashcam's video recording is not perfectly synchronized with the audio recording. (Gov't Ex. 1.) The audio lags the video by approximately 25 seconds, but the time discrepancy appears to decrease as the video progresses. At approximately minute 11:00 the video and audio appear to synchronize.

Asked if he could give the passenger's name, Look responded, "I don't know him name, I just met him." (Dashcam 03:51). Asked where Look was taking the man, Look stated, "down to my cousin's." Austin found it suspicious that Look had, in effect, changed his account in a manner that described the passenger as both his "friend's cousin" and his "cousin's friend." Look then repeated that his cousin was "Tim."

Austin asked Look to wait at the front of the cruiser and he then went to speak with the passenger. (Dashcam 04:20) While he did so, Gould came to stand with Look. Austin then asked the passenger a series of questions without having the passenger exit the vehicle. When asked, the passenger could not tell Austin the driver's name. The passenger said they had come from Taco Bell and were heading to Jonesport, rather than Cutler. Austin asked for and received the passenger's identification, which revealed he was Jose Miranda of the Bronx, New York. Austin returned to the cruiser to call in the names and Gould returned to the passenger side of the vehicle. Look waited at the front of the cruiser with his hands on the hood, as instructed. (Dashcam 05:10)

Austin's call to dispatch took approximately one minute and forty seconds. According to Austin, the information he previously gained through other law enforcement officers and a confidential informant included a report that Look was an associate of one Tim Cates (of Cutler) known to host drug dealers at his abode, and a report that there was a residence in Plymouth that law enforcement associated with the Sex Money Murder Gang, purportedly headquartered in the Bronx. This information was known to Austin; it was not relayed to him by dispatch.

Austin exited the vehicle (dashcam 07:52) and spoke once more with Look. Asked whether there was anything in the car they "shouldn't have," Look responded, "Nope. Not that I know of." Austin informed Look that he had a drug canine coming and advised Look to come clean if he had anything. Look repeated that he did not know of any drugs in the vehicle. Austin and Look briefly discussed the fact that Miranda had marijuana on his lap and Look stated he did not really know Miranda. Austin patted Look down again, placed Look in handcuffs (dashcam 09:25), and had him wait in the cruiser where it was warm. Austin then returned to the vehicle.

About this time, Trooper Jeremy Caron arrived on the scene. Austin told Miranda to exit the vehicle. Miranda complied and walked to the rear of the car, as directed. (Dashcam 10:00) When he arrived there, he leaned back against the trunk and raised his arms. Gould patted Miranda down for weapons, along his front waist and down the outside of his right leg, but he did not detect anything. Gould then motioned for Miranda to turn around. When Miranda turned around, Gould appears on the video to run a hand along Miranda's sacrum (dashcam 10:28) before patting down Miranda's left leg. The video and the audio at this point in time are not synchronized, and appear to be off by about 15 – 20 seconds (with the audio lagging behind). Austin then subjected Miranda to a more thorough pat down focused on Miranda's buttocks (dashcam 10:34). In the video, Austin can be seen leaning forward slightly and his left arm is fully extended. Given his height and position relative to Miranda, I find that Austin inserted his hand into the space between

Miranda's lower buttocks.[4] Austin felt an object in that location. On the recording, Austin can be heard to say, "There's something right there, dude." (Dashcam 10:51 (audio)). After announcing that he found something, the troopers placed Miranda in handcuffs. Approximately a minute later, Austin stated in response to Miranda's protest about the legality of the search: "You got dope in your ass."

Trooper Austin reported the discovery over the radio. He then retrieved protective gloves and a mask before returning to the back of the sedan. Austin pulled back Miranda's sweatpants and removed a condom taped along the inside edge of Miranda's right buttocks, extending down between his legs. Inside the condom were smaller packages, the contents of which evidently support the Superseding Indictment against Miranda and Look. Retrieval of the contraband took approximately five minutes, but the officers remained busy with Miranda for a few more minutes as they retrieved his coat from the car and prepared him for a transport incident to arrest. (Dashcam 18:00).

After placing Miranda under arrest, Austin and Gould searched the passenger compartment, for approximately four minutes. Austin then returned to his cruiser and gave Look the Miranda warning. Although Look argues the warning was inadequate in regard to Look's right to counsel, I find the warning was adequate. (Dashcam 22:20 – 22:50)

---

[4] Austin testified that he detected the object in Miranda's "right buttocks region," "just below the waistline," two or three seconds after starting to search. He also testified that Miranda wore very tight underwear briefs and that he (Austin) did not insert his fingers into any body cavity. On cross-examination, Austin testified the search was "for weapons," and that he "didn't feel inside [Miranda's] butt cheek." Austin also disagreed with counsel's suggestion that Austin had not merely felt the outside clothing, without pushing into the space between Miranda's "butt cheeks." Given the video evidence, I find that Austin's tactile exploration was not merely "just below the waistline" or along the outside contours of Miranda's buttocks. However, I do credit his statement that he did not insert his fingers into any body cavity.

After advising Look of his rights, the troopers still had some time to wait for the arrival of the drug-sniffing canine. While they waited, they opened the trunk of the sedan and searched one of two suitcases contained therein. The Troopers discontinued the search following the receipt of advice evidently radioed in from a sergeant. When the canine finally arrived on the scene, it did not alert to the presence of drugs.

Over the next day or few days, Trooper Austin prepared his report. Before he finalized the report, he received suggested edits from at least three persons, but he does not know if anyone else revised his report. Austin inserted several of the sergeant's suggestions in his report and, in doing so, neglected to remove quotation marks and/or italics font. Consequently, those passages in his report that appear in quotation marks and/or italics can be understood to be revisions introduced at the suggestion of others. Based on these formatting issues, counsel for Miranda filed the pending Motion to Compel Discovery.

On cross-examination, Trooper Austin testified that he had conducted several pat downs in the past, but on no prior occasion had he ever conducted a pat down for weapons that extended to the area between a person's buttocks, including during the pat down of Look that he conducted before the arrival of the other troopers. Trooper Austin also acknowledge on cross that the drug search conducted was "not [his] only goal" when he stopped Look that night.

## DISCUSSION

Miranda asks that the evidence obtained from his person and any and all resulting statements be excluded from evidence because they are the product of "a prolonged traffic

stop that included an extraordinarily intrusive full body search." Motion at 1. Miranda argues the Troopers extended the stop too long in relation to any permissible purpose for the stop and strayed beyond the scope of a traffic-related, protective pat down by conducting an overly intrusive drug-interdiction search of Miranda's person that was not supported by probable cause. *Id.* at 10 – 13.

"On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." *United States v. Delgado-Pérez*, 867 F.3d 244, 250 (1st Cir. 2017) (quoting *United States v. Winston*, 444 F.3d 115, 123 – 24 (1st Cir. 2006)).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. When law enforcement officers stop an automobile and detain its occupants, they have effectuated a "seizure" of everyone in the vehicle, which necessarily implicates the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018); *United States v. Chhien*, 266 F.3d 1, 5 (1st Cir. 2001). However, initiation of a traffic stop will not violate the detained individuals' constitutional rights if the stop is supported by the officer's observation of a traffic violation, *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009), or "a reasonable and articulable suspicion of criminal activity." *Chhien*, 266 F.3d at 6 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

After the traffic stop is initiated, the duration of the stop must conform to the law enforcement "mission," meaning the stop should endure only so long as is reasonable to

address the traffic violation or suspected criminal conduct that justified the stop at its inception, including the ordinary inquiries associated with traffic stops in general, such as driver identification and licensure, vehicle registration, and proof of insurance. *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018). However, the officer may also request identification from occupants other than the driver, where doing so does not prolong the stop unnecessarily. *Id.* And when in the course of these inquiries the officer's suspicions are reinforced by the "emerging tableau" of information, the officer is permitted to "increase the scope of his investigation by degrees." *Chhien*, 266 F.3d at 6 (citing *Terry v. Ohio*, 392 U.S. 1, 10 (1968) (discussing law enforcement's need for "an escalating set of flexible responses").

Reasonable suspicion of criminal activity requires "more than a naked hunch that a particular person may be engaged in some illicit activity," but yet "does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime." *Chhien*, 266 F.3d at 6; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch.""") (quoting *Terry*, 392 U.S. at 30). The degree of reasonable suspicion necessary to initiate or prolong a traffic stop is "dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). This standard looks to the particular facts of the case and requires "broad-based consideration of all the attendant circumstances." *Chhien*, 266 F.3d at 6 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Courts also routinely apply the "collective knowledge" or "pooled knowledge" principle, which allows for reasonable

suspicion to be "imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion." *United States v. Barnes*, 506 F.3d 58, 63 (1st Cir. 2007).

When circumstances justify a traffic stop, they also justify an order that the occupants – both driver and any passengers – exit the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *United States v. Tiru-Plaza*, 766 F.3d 111, 119 – 20 (1st Cir. 2014) (suggesting the justification is safety related, but focused on the legality of an ensuing pat-frisk). When occupants exit a vehicle, however, concerns for officer safety can arise. Consequently, if an officer has reason to believe someone who exited the vehicle may be armed and dangerous, the officer is permitted to perform a protective pat-frisk to determine whether weapons are present. *Tiru-Plaza*, 766 F.3d at 116.

For a person detained in a traffic stop to be arrested, or more comprehensively searched incident to arrest, the officers on the scene must develop probable cause to arrest in the course of the traffic stop. *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997); *see also Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (search "incident to" arrest may precede formal announcement of arrest, where officers have probable cause to arrest). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997). "The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances." *United States*

*v. Vongkaysone*, 434 F.3d 68, 73 (1st Cir. 2006) (citation omitted). "In dealing with probable cause, … we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

## A.    The Initial Stop

Neither Mr. Look nor Mr. Miranda argues that the traffic stop was unconstitutional from its inception. I pause here only to observe that Trooper Austin had both a reasonable articulable suspicion to make a traffic stop based on an exhaust violation, and a reasonable articulable suspicion that the occupants of the vehicle were associated with the drug trade and might be transporting illicit substances on their persons or in the vehicle.

## B.    Extension of the Stop to Investigate Drug Trafficking

Mr. Look and Mr. Miranda contend the traffic stop was unreasonably prolonged to investigate drug trafficking. Look Post-Hearing Mem. at 5 – 7; Miranda Mot. at 10 – 12; Miranda Post-Hearing Mem. at 3. Miranda further argues that, even if the extension of the stop was justified, the search of Miranda's person was more invasive than a pat down search for weapons and was not supported by probable cause. Miranda Mot. at 13 – 14; Miranda Post-Hearing Mem. at 9 – 10. Look further argues that the circumstances did not permit Austin to handcuff him and put him in the cruiser during the search of Miranda. Look Post-Hearing Mem. at 8 – 10.

In addition to law enforcement's collective knowledge concerning Look's background that earned him his mule profile, and the fact that he drove a considerable distance in order to collect and transport a young man Downeast, immediately upon

interacting with the vehicle's occupants Austin observed loose marijuana on the passenger's lap. The suspicion generated by these combined circumstances justified an extension of the traffic stop to separate the men for questioning concerning their relationship and travel itinerary, and concerning the presence of illegal drugs.

Look, who faced questioning first, certainly did not dispel Austin's suspicions when he was unable to articulate a scenario inconsistent with the idea that he was working as a mule. The fact that Look did not know his passenger, whom he described as both his friend's cousin and his cousin's friend, only reinforced Austin's suspicion. The way he vocalized his initial answer did not help, either. "He's just my friend's cousin, I guess." Even an Uber driver is likely to know a passenger's name.

The upshot of this preliminary exchange is that the Troopers acted within the bounds of reasonableness when they extended the traffic stop to obtain Miranda's identification and ask him some questions. The information Austin obtained from Miranda only amplified the suspicion. To begin, Miranda's identification card revealed he is a resident of the Bronx. And like Look, Miranda did not appear to know the first thing about his fellow traveler. He could not provide a name, and he did not even appear to know where they were going. Although Austin obtained this information without removing Miranda from the vehicle, given the consistent drumbeat of drug-trafficking characteristics, he acted well within the bounds of reasonableness when he asked Miranda to exit the car. Asking a passenger to exit a car is not outside the bounds of reasonableness, especially where, as here, the limited additional intrusion is justified by the information available to the officer. "An officer's actions must be justified at their inception, and any subsequent actions are

measured by the 'emerging tableau' of circumstances as the stop unfolds." *United States v. Orth*, 873 F.3d 349, 354 (1st Cir. 2017) (quoting *Chhien*, 266 F.3d at 6).

The problem, however, is that Austin did not remove Miranda from the car for the purpose of asking him face-to-face questions out in the open, where Miranda would not have access to any weapon potentially hidden in the vehicle. Austin had already asked Miranda all his questions. Consequently, I deduce that the decision to remove Miranda from the car was made with the specific intention of subjecting Miranda to a physical inspection. Assuming for the sake of argument that removing Miranda from the vehicle was within the scope of reasonable suspicion that informed the ongoing traffic stop, it is not a foregone conclusion that the Troopers were permitted to conduct a pat-down frisk to ensure officer safety. I say this because even a "minimally intrusive" pat-down frisk for weapons is deemed a serious intrusion in our jurisprudence, notwithstanding correspondingly serious officer-safety consideration. *See Orth*, 873 F.3d at 357 (carefully reviewing district court's determination related to suspicion of danger); *Tiru-Plaza*, 766 F.3d at 122 ("The pat-frisk surely represented a 'serious intrusion' upon Tiru's privacy." (quoting *Terry*, 392 U.S. at 17)); *but see*, *e.g.*, *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."); *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998) (holding that a reasonable suspicion basis to frisk "may be satisfied by an officer's objectively reasonable suspicion that drugs are present in a vehicle that he lawfully stops").

The record in this case does not speak to the Troopers' perception of danger. Neither Austin nor Gould testified that they perceived danger based on the behavior or appearance of either Look or Miranda. Based on my own review of the dash-cam video, neither of these young men appeared in any way aggressive or threatening. While both men appeared to be relatively solid in terms of build, neither gave off the least hint of a truculent or combative demeanor. They were entirely passive and compliant. Miranda, furthermore, exited the vehicle in the presence of three Troopers. The three Troopers also walked Miranda to the back of the vehicle and conducted a pat-down frisk, together. There was no testimony to explain why they felt their collective safety required a pat-down frisk in the space between Miranda's buttocks. Although Austin testified he was patting Miranda down "for weapons," in fact he was exploring the space between Miranda's buttocks specifically because he suspected he would find contraband drugs in that location. The totality of the circumstances as set out in the facts as I find them from the record leaves no other reasonable conclusion.

I do not have to resolve the question related to the reasonableness of the decision to remove Miranda from the vehicle and subject him to a pat-down frisk because, on this record, I am not persuaded that the Troopers subjected Miranda to a minimally-intrusive pat-down frisk. Instead, they performed a more invasive physical search for drug contraband, to include feeling or manipulating the space between Miranda's buttocks.[5] It

---

[5] While there are decisions that do not find buttocks pat downs particularly problematic, they tend to involve more nuanced findings related to perceived danger or suspicious conduct suggesting an effort to hide something in that location. *See*, *e.g.*, *United States v. Robinson*, 615 F.3d 804, 808 (7th Cir. 2010) (upholding weapon search that extended to the buttocks of a male who clenched his buttocks during the pat down); *United States v. Thomas*, 512 F.3d 383, 386 (7th Cir. 2008) (upholding tactile search between
*(continued next page)*

is one thing to conduct a pretextual stop so long as there is a reasonable articulable suspicion to do so. But the Government must bear up under scrutiny in such cases that the steps taken after the pretextual stop stay within the navigational beacons set out by fundamental Fourth Amendment jurisprudence. As is always true of such cases, context matters. The stop was permissibly motivated by law enforcement suspicion that Look and his passenger were engaged in the drug trade, not by the desire to deploy three Troopers to stem the tide of the loud muffler epidemic afflicting Maine communities. The Defendants broke the first rule of an alleged criminal enterprise; to wit, don't break the law while you're breaking the law. The loud exhaust furnished a reasonable basis to conduct the stop. But the ensuing encounter and in particular, the muscular *Terry* frisk of Miranda, appears to have been influenced at least in part by the Troopers' expectation that they would find drug contraband. Which is to say, there is nothing in the record suggesting that any of the Troopers purposely exceeded the limitations of a minimally intrusive frisk, but they exceeded those limitations nonetheless.

Because the Government has not persuaded me that the Troopers' reasonable articulable suspicion had ripened into an objective quantum of evidence to support

---

buttocks after already finding a weapon and contraband in suspect's waistband); *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) (same, involving behind-the-back, furtive behavior by suspect, as well as consent). The record in this case is not developed along those lines. It strikes me that a buttocks search clearly would be appropriate when taking a person into custody or when patting down an inmate. However, I do not see *Terry* and its progeny as authorizing buttocks searches as routine components of a pat down frisk for weapons during routine investigatory stops. The First Circuit has emphasized that a "pat-frisk" must be "limited in scope" to "the 'bare minimum needed to detect the presence of a [weapon].'" *Tiru-Plaza*, 766 F.3d at 122 (quoting *United States v. Romain*, 393 F.3d 63, 72 (1st Cir. 2004)). Before I would rule otherwise, minimally I would expect testimony directed to the issue of why an officer would expect someone to hide a weapon in the buttocks, and what that weapon might be, based on the training and experience of the officer testifying. That kind of evidence is not part of the record in this case.

probable cause needed to support an arrest and the more probing search of Miranda's person incident to arrest, the evidence recovered by the Troopers is subject to the exclusionary rule, including both the tangible evidence of drug trafficking and any testimonial evidence that is the product of the unlawful search of Mr. Miranda and the concomitant seizures of both Mr. Miranda and Mr. Look. *Murray v. United States*, 487 U.S. 533, 536 – 37 (1988).

## CONCLUSION

Defendant Jose Miranda's Motion to Suppress is GRANTED. Defendant Cody Look's oral Motion to Suppress is GRANTED. Defendant Miranda's Motion to Compel Discovery is DENIED as moot.

**SO ORDERED.**

**Dated this 12th day of January, 2020.**

/S/ LANCE E. WALKER
DISTRICT COURT JUDGE